# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION<br>777 6th Street, NW<br>Suite 700<br>Washington, DC 20001, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. No. |
| TODD T. SEMONITE, Lieutenant General<br>U.S. Army Corps of Engineers<br>441 G Street, NW<br>Washington, DC 20314, | ) ) ) ) ) | |
| and | ) ) | |
| ROBERT M. SPEER<br>Secretary of the Army<br>101 Army Pentagon<br>Washington, DC 20310, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This action challenges the United States Army Corps of Engineers' ("Corps")

July 3, 2017 issuance of a permit to Virginia Electric & Power Company—through Dominion

Energy ("Dominion")—authorizing Dominion to construct and operate an industrial-sized

commercial transmission line and associated towers (up to 295 feet tall) through the heart of one

of the most important historic and cultural regions in North America.  Although the Corps signed

this permit and accompanying environmental reviews on July 3, 2017, the Corps did not publicly

disclose those documents until July 6, 2017.

2.      The challenged federal permit authorizes Dominion to construct and operate a new electrical transmission line and switching station known as the Surry-Skiffes Creek-Whealton project ("the project").  The project consists of three components: (1) a 7.92-mile overhead transmission line, which includes a 4.11-mile crossing of the James River and the construction of seventeen in-river steel lattice towers up to 295 feet tall; (2) a new switching station; and (3) a 20.2-mile overhead transmission line from the new switching station to an existing substation.

3.      It would be impossible to select a more historically and culturally significant location to construct and operate this project.  The intrusive transmission line and the massive steel lattice towers supporting the transmission line will cut through or very near dozens of crucially important national park units, historic properties, and battlefields in the center of Virginia's "Historic Triangle."  The Corps identified nearly sixty properties that will be adversely impacted by this project, including Historic Jamestowne (the first permanent English settlement in North America and a world-renowned archaeological site), Captain John Smith Chesapeake National Historic Trail (the nation's first and only Congressionally-designated water trail, which follows the expeditions of Captain John Smith from 1607-1609), Colonial Parkway National Historical Park (a scenic parkway connecting our nation's early historic sites in a primitive setting), and Carter's Grove National Historic Landmark (listed on both the federal and state historic registers as one of America's most impressive examples of Georgian architecture).  Because this region is so critical to our nation's founding and to our citizens' understanding of our country's roots, Congress, federal agencies, and state agencies have for more than a century taken myriad steps to conserve this region and protect its integrity by maintaining the landscape in a pristine and primitive condition similar to what existed when Europeans first arrived to

Jamestowne in the early 1600s.  These nationally important objectives have been promoted and served through establishment of national park units, registration of properties on the National Register of Historic Places and/or the Virginia Landmarks Register, cultural landscape designations, archaeological projects, designation of this stretch of the James River as a Virginia Scenic River, and the current pursuit of a UNESCO World Heritage Site designation for Historic Jamestowne.

4.      The construction of an overhead transmission line and seventeen steel lattice towers up to 295 feet tall—the height of the Statue of Liberty—crossing the James River at one of its most scenic locations from many national park units and historic properties is highly controversial because it threatens the many decades of consistent efforts by Congress, federal agencies, state agencies, and private investors to conserve, protect, and maintain a relatively unspoiled landscape to foster an awareness and understanding of this Historic Triangle in a setting evocative of the early 17th century.  Indeed, this is the rare federally authorized project in which other federal agencies (as well as the public) have roundly opposed issuance of the permit due to the unmitigable nature of the project's impacts.  In particular, the National Park Service ("NPS") and the Department of the Interior ("DOI")—federal agencies with jurisdiction over many of the national park units and historic properties that will be directly impacted by this project—repeatedly raised substantial concerns about the project's impacts to the properties under their management and urged the Corps to deny the permit due to the project's significant impacts to irreplaceable historic, cultural, environmental, and socioeconomic resources.  The Corps did not adequately address these major concerns before issuing the challenged permit.

5.      In issuing the permit, the Corps prepared an Environmental Assessment ("EA") to analyze the impacts of, and alternatives to, the project under the National Environmental Policy

Act ("NEPA"), 42 U.S.C. §§ 4321-4370m.  Despite the substantially disruptive impacts of this project that will permanently mar the landscape from the vantage point of dozens of national park units and historic properties, the Corps determined that it was not required to analyze the project's impacts and potential alternatives in a more detailed Environmental Impact Statement ("EIS").  The Corps reached this decision despite many members of the public and three federal agencies—NPS, DOI, and the Council on Environmental Quality ("CEQ")—urging the Corps to prepare an EIS due to the significant impacts that will result from the project.

6.      In evaluating the impacts of the project on the dozens of national park units and historic properties in this region of unparalleled cultural importance for our nation, the Corps minimized the significance of the anticipated impacts by labeling all aesthetic, cultural, historic, and/or recreational impacts as "subjective" and thus insignificant since they are particular to the individual.  However, the Corps failed to take a "hard look" at these impacts in the manner required by NEPA because the significance of an impact does not turn on whether there is some level of subjectivity but whether, in fact, the introduction of a massive industrial project is a significant intrusion that negatively impacts the physical environment and the consequent visitor experience in enjoying the primitive landscapes that have been maintained and conserved for decades through conscious and deliberate efforts by Congress, federal agencies, and state agencies.  In downplaying the indisputable significance of this project, the Corps also failed to reconcile its finding of no significant impact under NEPA with the repeated determinations of the agency with jurisdiction over several impacted properties—NPS—that these impacts are indeed significant as that term is defined under NEPA, or the Corps' own determination that "the project will intrude upon the viewsheds of historic properties and on a unique and highly scenic

section of the James River" where the landscapes are "impressive and historically significant"
thus constituting "a national treasure."

7.      In the EA, the Corps dismissed, with little to no analysis, many seemingly feasible
alternatives that would eliminate—or at least significantly reduce—the substantial adverse
impacts that will result from the project.  The cursory alternatives analysis the Corps undertook
in the EA failed to consider the comparative benefits and impacts of each alternative, including
each alternative's anticipated impacts and benefits to tourism, the local economy, visitor safety,
and wildlife, thereby impairing the Corps' ability to make a well-informed decision on the basis
of all pertinent information.

8.      Due in part to the Corps' refusal to prepare an EIS despite consensus views
expressed by the public and sister agencies that an EIS is required under these circumstances, the
Corps subverted the express statutory purposes underlying NEPA by failing to involve the public
in the Corps' NEPA review process and thus excluding the public from the transparent and well-
informed decisionmaking process that Congress intended.  Notwithstanding the Corps' process
under a different statutory scheme—Section 106 of the National Historic Preservation Act
("NHPA")—the Corps never solicited public and agency comment on any draft EA or Finding of
No Significant Impact ("FONSI"), despite the fact that NEPA's regulations require agencies to
circulate a draft EA and FONSI for a minimum 30-day public comment period for a precedent-
setting action of this kind that will serve as the first major industrial development to intrude into
this pristine landscape that is vital to the historic, cultural, and environmental integrity of this
region.  Regardless of whether the Corps satisfied its NHPA obligations, the Corps made no
attempt to engage the public in any meaningful way in its NEPA process, which is particularly

troubling in light of NEPA's express purposes and the indisputably significant impacts that will occur to irreplaceable national resources as a result of this project.

9.      In addition to considering alternatives under NEPA, the Corps also analyzed various project alternatives under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, which prohibits the Corps from authorizing dredge and fill activities if there is a practicable alternative that will have less environmental and related impacts.  *See* 40 C.F.R. § 230.10(a).  Rather than first determining the relative impacts of each alternative and then determining whether each alternative is practicable starting with the least environmentally damaging option, the Corps never made any determination as to the relative environmental impacts of each alternative and instead relied solely or primarily on project cost to deem several low-impact or no-impact alternatives impracticable.  Because the Corps failed to quantify the relative impacts of each alternative, the Corps also failed to take into account as part of its practicability determination the significant loss of revenue for the regional economy that is expected to result from the project as compared to alternatives that would maintain the status quo as to the economic benefits afforded to local communities.

10.     For these reasons and those set forth below, the Corps' decision to authorize this project and its significant and irreversible impacts in the heart of one of our nation's most important historic regions without addressing these impacts in the manner required by NEPA and the CWA is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" and "without observance of procedure required by law," within the meaning of the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).  Accordingly, the Corps' permit, EA, FONSI, and CWA Section 404 Statement of Findings should be vacated and remanded to the agency for further consideration.  *Id*.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 1346 (United States as a Defendant), and the APA.

## PARTIES

12.     Plaintiff National Parks Conservation Association ("NPCA") is an independent,

nonprofit membership organization founded in 1919 and headquartered in Washington, DC.

NPCA is the only nonprofit organization in the United States focused solely on the protection

and conservation of the national park system.  With more than 1.3 million members and

supporters nationwide, and more than 36,000 members and supporters in Virginia, NPCA works

to protect and preserve our national parks, including Colonial National Historical Park and the

Captain John Smith Chesapeake National Historic Trail, for present and future generations.

NPCA's Mid-Atlantic regional office is located in Washington, DC and works to safeguard

national parks in Delaware, the District of Columbia, Maryland, Pennsylvania, Virginia, and

West Virginia.

13.     NPCA staff, members, and supporters frequently visit Colonial National

Historical Park, which includes the Colonial Parkway and Jamestown Island, Captain John Smith

Chesapeake National Historic Trail, and many of the historic properties that will be adversely

impacted by this project.  NPCA staff, members, and supporters use these national park units and

historic properties for solitude, recreation, kayaking, wildlife viewing, photography, aesthetic,

scientific, cultural, historic, and educational purposes.  For nearly a century, NPCA and its staff,

members, and supporters have expended countless time and resources ensuring long-term

protection and conservation of these important areas that are crucial to our nation's beginnings,

as well as enjoying this region in its relatively pristine, quiet, and visually appealing condition

that is devoid of any industrial developments from key vantage points within these national park lands and historic properties.

14.     In 2011, NPCA extensively researched and then published a "Making Connections" report to spotlight the crucial role Colonial National Historical Park plays in the region's economy and its quality of life.  Among other findings, the report explained that, in 2010, nearly 3.5 million people visited Colonial National Historical Park, resulting in an estimated $327 million spent in the region in 2010 alone, at least $42.5 million of which could be directly attributed to Colonial National Historical Park (rather than to other regional tourist draws such as Carter's Grove National Historic Landmark).  NPCA's report found that Colonial National Historical Park visitor spending was vital to the regional economy, supporting at least 1,184 local park-related and tourism-related jobs and thereby further bolstering community economic development.

15.     Because of the nationally significant importance of the national park units and historic properties that will be permanently impaired by this project, NPCA has advocated since the inception of this project for the Corps to deny the challenged permit application and consider feasible alternatives that would achieve the purpose and need of this action without irreversibly scarring America's quintessential historic landscape.  NPCA has also repeatedly urged the Corps to, at minimum, prepare an EIS because of the substantial impacts that will result from the project.  Despite NPCA's requests, the Corps issued the permit without fully analyzing many alternatives that could have eliminated (or at least reduced) the significant impacts of the project, and in the process failed even to prepare an EIS or solicit public comment on a draft EA and FONSI.  As evident from NPCA's constant and active participation in other forums throughout this decisionmaking process (e.g., the NHPA Section 106 process), NPCA would have

participated in any EIS process or other public comment process under NEPA by submitting detailed comments, accompanied by independent expert analysis, addressing the impacts of, and alternatives to, the project.  Because the Corps failed to allow any public comment on a draft EA and FONSI, NPCA was deprived of any opportunity to meaningfully participate in the NEPA process to ensure that the Corps' final decision is well-informed and based on the best available evidence and information concerning impacts to electricity generation, socioeconomic issues, wildlife, safety, and other concerns.

16.    The legal violations alleged in this complaint—which are traceable directly to Defendants' conduct—cause concrete and permanent injuries to the conservation, recreational, aesthetic, scientific, historic, cultural, and educational interests of NPCA, its members, and its supporters.  These actual, concrete interests of NPCA's members have been, and, absent relief from this Court, will continue to be adversely and irreversibly injured by Defendants' failure to comply with federal law.  Relief from this Court, including vacatur of the challenged permit pending full compliance with NEPA and the Clean Water Act, will remedy NPCA's injuries.

17.    Defendant Todd T. Semonite is the Lieutenant General of the Corps and is directly responsible for the supervision, management, and control of the Corps.  Accordingly, he is responsible for overseeing the Corps' decision challenged in this action and is sued solely in his official capacity

18.    Defendant Robert M. Speer is the Secretary of the Army and is ultimately responsible for overseeing the work of the Corps, an agency within the Department of the Army. He is sued solely in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The National Environmental Policy Act

19.     NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  *Id.* § 1500.1(b), (c).

20.     CEQ—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500-1508, which are "binding on all federal agencies."  *Id.* § 1500.3.

21.     To accomplish its underlying goals, NEPA requires federal agencies to prepare a "detailed statement"—i.e., an EIS—for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(c).  An EIS must describe (1) "the environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action."  42 U.S.C. § 4332(C)(i)-(iii). By definition, the environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts.  40 C.F.R. § 1508.8(b).

22.     Each EIS must consider the underlying federal "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "*all* reasonable alternatives" to the proposed action.  40 C.F.R. §§ 1502.13, 1502.14 (emphasis

added).  NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(E).  CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.

23.     In evaluating the alternatives of a proposed action, NEPA requires that agencies take a "hard look" at the effects of the proposed action as compared to all reasonable alternatives.  *See* 40 C.F.R. §§ 1502.1, 1502.16.  The EIS must assess the direct, indirect, and cumulative impacts of the proposed action on the environment, including adverse environmental effects that cannot be avoided, *id.* § 1508.25.  Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are those "caused by the action" that occur "later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8.  Cumulative impacts are those that result from the "incremental impact[s]" of the proposed action when added to the impacts of other past, present, and reasonably foreseeable future actions, whether undertaken by other federal agencies or private third parties.  *Id.* § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  *Id.*

24.     Where an agency is uncertain as to whether NEPA requires preparation of an EIS or the agency has determined that no EIS is required, the agency must prepare an EA that analyzes the environmental impacts of the proposed action as well as alternatives.  40 C.F.R. §§ 1501.4(c), 1508.9.  Although less rigorous than an EIS, an EA must "include brief discussions"

analyzing direct, indirect, and cumulative impacts of the proposed action, as well as alternatives

to the action. *Id.* § 1508.9.

25.     In determining whether an EIS is required, an agency must consider whether the

proposed action has a "significant" effect on the human environment.  40 C.F.R. § 1508.27.  The

"significance" determination is based on factors such as effects to "[u]nique characteristics of the

geographic area such as proximity to historic or cultural resources, park lands, prime farmlands,

wetlands, wild and scenic rivers, or ecologically critical areas," "the degree to which the effects

on the quality of the human environment are likely to be highly controversial," "[t]he degree to

which the action may establish a precedent for future actions with significant effects," "[t]he

degree to which the action may adversely affect districts, sites, highways, structures, or objects

listed in or eligible for listing in the National Register of Historic Places or may cause loss or

destruction of significant scientific, cultural, or historical resources," or "[t]he degree to which

the action may adversely affect an endangered or threatened species or its habitat that has been

determined to be critical under the Endangered Species Act ."  *Id.* § 1508.27(b).  The presence of

any of these factors requires the preparation of an EIS.

26.     When an agency determines that an EIS is not required, it must issue a FONSI

explaining the reasons why the agency has determined that its proposed action "will not have a

significant impact" on the environment. 40 C.F.R. § 1508.13.

27.     Public disclosure of important information concerning an agency's proposed

action, its impacts, and reasonable alternatives to the action is central to NEPA's statutory and

regulatory scheme, regardless of whether an agency prepares an EIS or an EA.  For example, the

CEQ regulations require that federal agencies "shall to the fullest extent possible . . . encourage

and facilitate public involvement in decisions which affect the quality of the human

environment," 40 C.F.R. § 1500.2, and require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id*. § 1506.6(a).  Thus, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b).  Accordingly, NEPA's implementing regulations explain that "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

28.     To accomplish NEPA's public disclosure and involvement requirements, both draft and final EISs must be circulated for public comment, and the agency must respond to comments received.  40 C.F.R. § 1503.4.  NEPA also requires agencies to solicit public comment for a minimum of 30 days with respect to any draft EA and FONSI where either: (1) "[t]he proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement," or (2) "[t]he nature of the proposed action is one without precedent." *Id.* § 1501.4(e)(2).  CEQ has further clarified the circumstances in which NEPA requires a 30-day public comment period for a draft EA and FONSI, including "(a) if the proposal is a borderline case, i.e., when there is a reasonable argument for preparation of an EIS; (b) if it is an unusual case, a new kind of action, or a precedent setting case such as a first intrusion of even a minor development into a pristine area; (c) when there is either scientific or public controversy over the proposal; or (d) when it involves a proposal which is or is closely similar to one which normally requires preparation of an EIS."  46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981).  "Agencies also must allow a period of public review of the FONSI if the proposed action would be located in a floodplain or wetland." *Id.*

### B.     The Clean Water Act

29.     The CWA is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA generally prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit. *See id.* § 1311(a). The term "discharge of fill material" is defined as "the addition of fill material into the waters of the United States" or the placement of fill necessary for the construction of any structure in the waters of the United States. 33 C.F.R. §§ 323.2(f), 323.3(c); 40 C.F.R. § 232.2.

30.     Section 404 of the CWA authorizes the Corps to issue permits for the discharge of dredge or fill material into waters of the United States. 33 U.S.C. § 1344. The Corps adopted regulations, known as the "public interest" factors, to implement its permitting authority. 33 C.F.R. § 320. "Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process." *Id.* § 320.4(a)(1). The Corps must consider a broad range of potential relevant impacts as part of its public interest review, including "conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." *Id.*

14

31.     In addition, the Environmental Protection Agency ("EPA") has promulgated regulations, known as the "404(b)(1) Guidelines," for Section 404 permits.  33 U.S.C. § 1344(b)(1); 40 C.F.R. § 230.  The Corps reviews all proposed Section 404 permits under both the Corps' public interest factors and EPA's 404(b)(1) Guidelines.  33 U.S.C. § 1344(b)(1); 33 C.F.R. § 320.2(f).  A permit must be denied if it is contrary to the public interest or does not comport with the Section 404(b)(1) Guidelines.  33 C.F.R. §§ 320.4, 323.6; 40 C.F.R. §§ 230.10, 230.12.

32.     To ensure these mandatory CWA requirements are satisfied, the Corps must fully evaluate the direct, secondary, and cumulative impacts of the activity, including impacts to aesthetics, recreation, and fish and wildlife.  *See, e.g.*, 33 C.F.R. §§ 320.4(a)(1), 336.1(c)(5) (endangered species), 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§ 230.11(a)-(h), 230.20-23 (aquatic ecosystem), 230.30 (threatened and endangered species), 230.31 (fish and wildlife), 230.51 (recreational and commercial fisheries), 230.52 (water-related recreation), 230.53 (aesthetics).  In particular, the Corps must set forth its findings in writing on the short-term and long-term effects of the discharge of dredge or fill activities, as well as compliance or non-compliance with the restrictions on discharge.  40 C.F.R.. §§ 230.11, 230.12(b).

33.     The "loss of values" that the Corps must consider in evaluating the impact of a discharge on the aesthetic characteristics of an aquatic ecosystem includes "mar[ring] the beauty of natural aquatic ecosystems by degrading water quality, creating distracting disposal sites, inducing inappropriate development, encouraging unplanned and incompatible human access, and destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area."  40 C.F.R. § 230.53(b).

34.     EPA's 404(b)(1) Guidelines prohibit the Corps from authorizing an application for dredge and fill activities if there is a practicable alternative which would have less adverse impact. *See* 40 C.F.R. §§ 230.10(a), 230.12(a)(3)(i). The Corps must document its findings of compliance or noncompliance with these restrictions. *Id.* § 230.12(b). Practicable alternatives are those alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). "Fundamental to [404(b)(1)] Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." *Id.* § 230.1(c).

### C.     The Administrative Procedure Act

35.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

### A.  The Corps' CWA Initial Public Notice of Dominion's Permit Application

36.    On August 28, 2013, the Corps formally notified the public that it had received an application from Dominion for federal permits under Section 404 of the CWA and Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403.  The permit application requested that the Corps approve the Surry-Skiffes Creek-Whealton project in essentially the same configuration ultimately approved by the Corps four years later.  The permit application identified the purpose of the project as constructing a new commercial transmission line and associated components in order to address the purported need to improve regional grid reliability, deactivate two coal-fired generators operated by Dominion at its Yorktown facility, and ensure Dominion's legal compliance with EPA's Mercury Air and Toxics Standards Rule by April 2015.  The Corps' notice solicited comments from the affected public and relevant agencies.  Without any explanation, the Corps' notice asserted that "[p]reliminary review indicates that no [EIS] will be required," thereby making this crucial legal determination before analyzing the project's impacts or even receiving input from the public or agencies as to the significance of any such impacts.

37.    In response to its public notice, the Corps received comments overwhelmingly opposing the project.  In particular, NPS—the Corps' sister federal agency with jurisdiction and management responsibility over various national park interests in this region—raised serious concerns with the proposed project and identified numerous significant impacts that would occur to NPS-managed properties and visitors to those properties.  For example, in its September 2013 comments, NPS stated that "we have strong concerns for potential visual impacts of the proposed project on NPS resources and interests, the potential impact to the recreation resources we are able to offer visitors, and potential health and safety risks to our visitors on the James River."

17

NPS explained that the project "would substantially alter the visual setting for multiple historic sites including Colonial National Historical Park and the Captain John Smith Chesapeake National Historic Trail" because "[e]xisting landscape vistas that are 'evocative of the 17th century' have been identified as an associated resource value related to the significance statements of the park and trail."  As a result, NPS explained that "[t]he industrial intrusion would substantially reduce the sense of being in a historic setting and in some cases, reduce the isolation that would be reminiscent of the early voyages up the James River."  In addition to significant aesthetic effects, NPS explained that the project would interfere with NPS's "fundamental role" at these park units in providing "[r]ecreational activities such as walking, boating, and driving for pleasure."  NPS also identified the "[h]ealth and safety issues" the project would create because "NPS visitors travel the river in all manner of water craft from small kayaks and canoes to large sail and motorized pleasure boats" and "[t]he presence of 17 jacketed towers and fender protection systems add obstacles to the river that would present a challenge for visitors to safely navigate around."  Finally, NPS raised substantial concerns with the economic impacts of the project, stating that the project will likely reduce "area tourism overall and the economic benefits that result" in light of the fact that "the Historic Triangle draw[s] approximately 6 million visitors annually who contribute $1 billion to the economy and generate approximately $80 million annually in state and local tax revenues."

38.     Rather than itself respond to the many comments opposing the project, identifying significant impacts, requesting preparation of an EIS, and urging the consideration of alternatives that would avoid an overhead transmission line crossing of the James River, the Corps instead allowed Dominion's hired contractor (Stantec) to compile the public comments and respond on behalf of Dominion—i.e., the applicant with a vested interest in permit approval.  With respect to

comments urging preparation of an EIS, the company cursorily responded that "[t]he purpose of the EIS is to identify resources that could potentially be impacted by the project and to evaluate the significance of those impacts" and "[t]hat evaluation has been performed."  In other words, the company seeking permit approval—rather than the federal agency responsible for complying with NEPA (the Corps)—made legal determinations concerning the need for an EIS long before the Corps had actually analyzed the impacts of, or alternatives to, this project.

39.     Concurrent with the NHPA Section 106 process described below, the Corps held a single public meeting in October 2015 concerning Dominion's permit application.  The Corps' notice informing the public of this meeting referenced in passing that the meeting—and any comments received immediately after the meeting—would "be used to inform the necessary [NEPA] analysis and documentation," but clarified that the underlying purpose of the public meeting, and the statutory authority for it, was to comply with "Section 10 of the Rivers and Harbors Act . . . [and Section] 404 of the Clean Water Act."  With respect to the passing reference to NEPA, the notice stated that "[i]nformation related to these processes including draft or final documents will be made available as appropriate."  As explained below, however, no draft NEPA documents were ever made available for public or agency comment.

### B.     The NHPA Section 106 Process

40.     Section 106 of the NHPA sets forth a process requiring federal agencies to take into account the effects of a proposed project on historic properties and to afford the Advisory Council on Historic Preservation (and other consulting parties) a reasonable opportunity to comment on those effects and determine what mitigation measures are necessary.

41.     In 2014, the Corps initiated the Section 106 process for this project and designated Plaintiff NPCA as a consulting party for NHPA purposes.  Although the Section 106

process focused only on historic resources and is not tantamount to NEPA compliance, which encompasses examination of a much broader array of impacts, NPCA, NPS, and other consulting parties nevertheless submitted various comments during the Section 106 process repeatedly urging denial of the permit, identifying significant project impacts, requesting consideration of feasible alternatives that would eliminate or reduce project impacts (including alternatives developed by independent experts in electricity transmission), and arguing that an EIS is necessary under NEPA. The record is replete with such comments; this Complaint summarizes only the most consequential of them.

42.     In June 2014, NPS submitted a letter to the Corps explaining that "[a]lternatives that avoid a new crossing and use either underground transmission, existing crossings or other means would be preferred by NPS and we believe are the only methods for avoiding or minimizing effects of the transmission line project." Thus, NPS "strongly encourage[d] the [Corps] to explore additional alternatives with [Dominion] that would further minimize or eliminate the potential adverse effects." On the same day, a different division of NPS—the agency's American Battlefield Protection Program ("ABPP")—sent a letter to the Corps explaining that "[t]he project site . . . does fall partially within the boundaries of multiple ABPP recognized battlefields," which would result in substantial impacts because "[t]his area of Virginia saw heavy military occupation and action during the Revolutionary War, War of 1812, and the Civil War, particularly the Peninsula Campaign of 1862."

43.     In 2015, with the Corps failing to heed the advice of NPS and other diverse stakeholders, opposition to the project and calls for enhanced transparency intensified. For example, in July 2015, United States Senator Mark Warner (Virginia) sent a letter to the Corps explaining that "[t]he potential impacts to national parks and historic landmarks, endangered

species, and the tourism-based economy are such that this proposal should receive the utmost

scrutiny." Thus, he "ask[ed] that the Amy Corps complete an [EIS] to provide the public with an

analysis of reasonable alternatives to this proposal."

44.    In August 2015, the Keeper of the National Historic Register commented on the

project.  She explained in detail the importance of the project area:

> The English colonization of North America was an extraordinary undertaking
> which had a profound impact on the Old World and the New and much of what was
> to come had its origins here along the James River: the establishment and growth
> of the first permanent English settlement in the New World; some of the earliest
> and most sustained interactions (both cooperative and antagonistic) between the
> original inhabitants of the area—the American Indians—and the Europeans; the
> initial English voyages of discovery which took them throughout the Chesapeake
> Bay and into the interiors following the numerous rivers and led to expanding
> contact with the American Indians and the spread of English settlement; the
> foundation and development of the tobacco economy which would dominate the
> Chesapeake Bay world; the introduction and firm establishment of chattel slavery;
> the architectural evolution of buildings in the James River area from the first crude
> huts built by the English to the flowering of the dominant Georgian architectural
> style; and the growth of the unique political and social institutions which would
> lead to the development of representative democracy and the growing impulse of
> the colonists to gain independence and self-rule from the corporate founders of the
> colony and later their royal master the King.

She noted that the area of effects from the project

> includes numerous significant historic properties already listed in the National
> Register of Historic Places including all or parts of: Colonial National Historical
> Park; Jamestown National Historic Site; Colonial Parkway; Yorktown Battlefield;
> Kingsmill Plantation (which includes a series of important archeological sites);
> Carter's Grove National Historic Landmark, one of colonial America's most
> impressive examples of Georgian architecture (built 1750-1755) noted for its
> exquisite brickwork and finely crafted, fully-paneled interior; the archeological site
> of Martin's Hundred located at Carter's Grove (established in 1619 as one of the
> earliest English settlements outside of Jamestown Island, it was destroyed in the
> American Indian uprising of 1622); and a number of other archeological sites.

With respect to the Captain John Smith Chesapeake National Historic Trail, she determined that

the segment of the James River impacted by the project "is among the most historically

significant portions of the overall National Historic Trail's 3,000 plus miles of waterways."

Finally, she "determined that the entire area encompassed by the [project's area of potential effects] is eligible for the National Register of Historic Places . . .  in the areas of significance of Exploration/Settlement, Ethnic Heritage, and Archeology" because "[t]his historic district forms a significant cultural landscape associated with both the American Indian inhabitants of the area and the later English settlers."

45.     In November 2015, the Virginia Department of Historic Resources determined "that this project will result in an adverse effect to historic properties, several of which represent the Commonwealth's most significant landmarks."  The letter also determined that "[t]he addition of an overhead power line to this largely undeveloped section of river will irreparably alter the character of the area, solidifying its status as an industrial commercial corridor and opening the door to subsequent development and associated cumulative effects."

46.     Throughout 2015, NPS continued to urge the Corps to adopt an alternative approach that would eliminate (or at least reduce) the impacts of the project.  For example, in July 2015, NPS determined for the first time that "the project as proposed will have significant adverse effects to historic resources that are of the utmost importance and integral to the development of the United States."  In turn, later that month, NPS explained that "[g]iven the magnitude of the project and the significant impacts on historic properties and other resources of concern, [NPS] believes an [EIS] needs to be prepared" and that "NPS expects to provide additional comments in the process of preparing such an EIS."  NPS concluded that "[t]he line and towers would introduce a major new industrial use directly visible to park visitors and contrasting with the current historic setting, feeling and landscape of the park" and thus "[t]he result would be highly diminished historic integrity" and "significant adverse impacts to the trail, trail resources and visitor experience."

47.     In September and October of 2015, NPS sent additional letters stating NPS's conclusions that "a full [EIS] is required for the project in order to adequately evaluate alternatives and their impacts" and that "the proposal to construct an overhead power line across the James River in this location would result in an unacceptable level of damage to this historically important area."  As a result, NPS determined that "[t]he multiplicity of effects to so many unique resources and the region, combined with the sheer magnitude and complexity of any mitigation needs to address these effects, should point to one conclusion: an overhead power line proposal is unsuitable in this location."  NPS reiterated these conclusions in a public statement in which the agency explained that "[t]he economic impact of visitation just to Colonial National Historical Park was $254 million in 2014" and stressed that this project "should not be constructed" because "[p]ermanently marring the landscape of a national treasure comes at an enormous cost and creates an unacceptable result."  At minimum, NPS urged the Corps "to use an environmental impact statement to consider alternative options that will not result in permanent damage to the integrity of one of our nation's most historically significant landscapes."

48.     In November 2015, NPS explained to the Corps that it "feels strongly that an [EIS] is the proper way to fully assess the direct and indirect effects of a large-scale infrastructure proposal on an irreplaceable landscape," which would also "enable a far more thorough evaluation of the range of impacts on cultural and natural resources implicated across a series of alternatives, and can inform options for a solution that avoids or minimizes cumulative effects on historic properties and other resource values."

49.     In December 2015, NPS Director Jon Jarvis sent a letter to the Corps.  Director Jarvis explained NPS's view that "[t]his project would seriously impact irreplaceable, nationally

significant resources" and that "[r]unning power lines through the landscape where the earliest days of American history were written will forever change the ability of Americans to experience and understand our nation's earliest days." He stressed that "[t]he project would cause severe and unacceptable damage to this historically important area and the irreplaceable and iconic national resources within it." In particular, Director Jarvis concluded that the project "would mar the historic setting that represents the very beginnings of and the military defense of our nation" and "would be a massive and modern industrial intrusion in a landscape that retains the feeling and appearance of long ago." He stated that the project "would forever degrade, damage, and destroy the historic setting of these iconic resources" and "would set a precedent for additional development." Director Jarvis also explained that "NPS is working with state and local organizations to get the Jamestown Island placed as a significant site on the list maintained by United Nations Educational, Scientific, and Cultural Organization ("UNESCO") [which] . . . . is the first step to designation as a World Heritage Site," and expressed concern that "[t]his project will jeopardize those efforts, eliminating the potential for the Commonwealth of Virginia to claim the home to a World Heritage site and attract millions of visitors from around the world." He concluded that "[n]o amount of mitigation could possibly counteract the severity of the effects that would be caused by this proposal"; thus, he "urge[d] the [Corps] to deny the permit for the proposed overhead line and to . . . further examine the many other solutions available through an [EIS]."

50.     Despite nearly unanimous criticism and opposition to the project and repeated calls for an EIS to evaluate project impacts and reasonable alternatives that could eliminate or reduce those impacts, the Corps and Dominion plowed ahead with the Section 106 process. In 2016, NPS sent nearly a dozen formal letters identifying significant environmental impacts,

requesting a transparent evaluation of alternatives, and determining that NEPA requires an EIS under these circumstances.  For example, in January 2016, NPS urged the Corps "to deny the permit for the proposed towers and transmission line" and stated NPS's views that "alternative solutions to meet the region's power needs do exist and must be pursued so that the historic landscape of Jamestown and the many other nationally significant resources are not forever marred."  NPS reiterated that "[t]he significance of the area . . . has led to huge investments on a landscape scale throughout the region in land conservation, tourism, resource documentation, archaeology, cultural landscape designations, numerous National Register of Historic Places listings, the establishment of three historical units in the National Park system, and the pursuit of a World Heritage Site designation for Jamestown."  Hence, NPS explained that "[t]he project proposal would slice at the heart of this landscape, cutting away a piece of the significance of the whole watershed and the multi-state historic trails."

51.      In another January 2016 letter, NPS painted a picture for the Corps of the serious impacts that the project will cause:

> Within the Historic District the James River is unblemished by any man-made physical crossing.  The landscape pattern of the district and this portion of the national historic trail—whether viewed from the water or from multiple historic properties on land—is one of broad, open, unmarred water and sky surrounded by an extensively wooded shoreline.  It is a pattern that creates, retains and conveys the *setting* and *feeling* associated with criteria and significance for which the Historic District was determined eligible, and the national significance and themes for which the trail was established.  The proposed 7.76 mile transmission corridor, with 4.1 miles crossing the river and 17 towers up to 295' tall sited in the river, plus additional towers on land, would permanently destroy the character-defining feature of the unblemished river.

In that same letter, NPS explained that "[t]he National Park Service Organic Act (16 U.S.C. [§] 1, 2, 3, and 4) requires the NPS to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such

means as will leave them unimpaired for the enjoyment of future generations."  Under that

statutory obligation, NPS determined that "the impacts to Jamestown Island and the Colonial

Parkway and thereby to Colonial National Historical Park are clearly significant and may

constitute impairment under the Organic Act"—meaning that NPS itself would not have been

able to authorize such a project due to the impairment of park resources that will result.

52.     In February 2016, NPS once again determined that "the impacts of the proposed

project are clearly significant and continuing to pursue the current Dominion proposal

unquestionably requires an [EIS]."  NPS explained the importance of an EIS here because "if

those analyses were in the context of an EIS which is considering a full range of alternatives[,]

we expect more viable and less impactful alternatives would be discerned."

53.     Despite the lack of any NEPA public comment process, Plaintiff NPCA and other

stakeholders submitted various alternatives that would eliminate or at least substantially reduce

the project's impacts, including alternatives developed by independent experts.  As NPS

explained in March 2016, "[t]he current process has not afforded the NPS or other stakeholders

an opportunity to assess the varying impacts of several alternatives. . . . [However,] [a]n EIS

would afford the Corps, NPS, other stakeholders, and the public the opportunity to evaluate and

compare impacts of a range of alternatives in order to foster informed decision making and

public disclosure."  NPS then explained that it was "our understanding . . . that because

Dominion does not wish to voluntarily initiate an EIS, the EA process has continued," which

"leaves us (and the other consulting parties and the public) in the position of having little, if any

insight into the Corps' analysis of the issues beyond statements that an EA is being prepared and

no decision has been made regarding a [FONSI]."  NPS explained that "[w]ithout a draft NEPA

document that is circulated for public review, which would be part of the EIS process, the

process for this proposed project has lacked the transparency and clarity to best understand the impacts of the proposal and its alternatives."  In any event, NPS once again concluded—after evaluating the NEPA "significance" factors that agencies such as NPS and the Corps must apply in determining whether an EIS is necessary—that "[i]n our view, a project of such substantial dispute as to the nature of adverse impacts to nationally significant resources clearly merits—and we believe *requires*—the preparation of an EIS.  *See, e.g.*, 40 C.F.R. [§] 1508.27(3), (4), (8)."

54.     In 2016, many of the Section 106 consulting parties raised grave concerns as to the Corps'—and Dominion's—refusal to seriously consider under NEPA and the CWA implementation of various alternative project configurations that would eliminate or at least significantly reduce project impacts by burying the transmission line under the James River or otherwise avoiding the construction of an overhead transmission while still satisfying regional energy demand.  In October 2015, the Corps issued a short "preliminary alternatives conclusion white paper" rejecting as impracticable all but two alternatives, each of which contained an overhead 500kV transmission line.  Despite the lack of any NEPA public comment period as required by that statute, in response to the Corps' "white paper" Plaintiff NPCA and other Section 106 consulting parties (e.g., the National Trust for Historic Preservation) retained independent experts from Princeton Energy Group International and Tabors Caramanis Rudkevich to develop practicable, feasible alternatives that would satisfy the energy demand and the grid reliability needs articulated by Dominion, while eliminating or at least substantially reducing the impacts of the project on nationally important parks and historic properties.  Despite the consulting parties' and independent experts' extensive analyses documenting the practicability of myriad alternatives that would achieve the project's purpose and need in light of current information, Dominion and its hired consultant (Stantec) responded in various letters by

summarily rejecting any alternatives that did not involve an overhead transmission line with a river crossing due primarily to the costs associated with project construction or the time needed to construct the project.  The Corps itself never responded to any of the expert reports recommending project alternatives and examining their ability to satisfy the project's purpose and need, instead allowing Dominion—the permit applicant with a vested interest in timely project approval—to respond to these newly developed alternatives.  This led NPS to comment, in June 2016, that the Corps "appears to have rejected a number of potential alternatives that would involve the use of underground transmission lines due to cost and time concerns"; however, NPS explained that "much has changed since Dominion first submitted its proposal." Thus, "NPS request[ed] that [the Corps] revisit the use of underground transmission lines in completing the Surry Skiffes Creek project, which would potentially reduce or eliminate certain impacts in this historically significant portion of the river."  NPS also raised concerns about the project's purpose and need because "accurate determination of the supply of electricity needed and the likely amount of growth in demand over time are key to identifying the appropriate range of alternatives that could satisfy these goals."  NPS stated, "[i]f less electricity is needed to satisfy demand, less environmentally impactful alternatives may be viable, possibly leading to the identification of a different least environmentally damaging practicable alternative under [Corps] guidelines."

55.     In July 2016, NPS yet again urged the Corps to deny the permit because "[c]enturies of preservation efforts have allowed this setting to remain intact for 400 years," but "[c]onstruction of the proposed power line and towers through this iconic landscape will significantly impact the ability of these historic resources to commemorate the views of the James River, views that are integral to their historic integrity and define their setting."  In turn,

NPS pointed out the highly precedential nature of this first-ever industrial project in this historic setting, explaining that "permitting an overhead modern structure such as this will set the stage for just about any other intrusion that is proposed" because "[o]nce a major modern structure such as the Dominion proposal is permitted, what grounds would remain for protecting this iconic historic landscape from other modern intrusions?"  NPS again explained that an EIS is required because project impacts are "too significant to permit," and stated that "[a]s the agency with responsibility and experience caring for many of our nation's most significant historic resources, we request the [Corps] respectfully consider our input to help protect these remarkable resources for future generations."  NPS—which routinely complies with NEPA for its own actions—then formally determined that "[b]ecause the project clearly meets the CEQ significance criteria for a project having the potential to significantly affect the human environment, an EIS is required."  In sum, NPS concluded that "[a]n EIS is clearly justified, appropriate, and required in this case."

56.    In October 2016, NPS continued to press the Corps to prepare an EIS to analyze the significant impacts of this project and to consider feasible alternatives to it, writing:

> NPS maintains that the range of available alternatives is broader than has been proposed, due to a changing set of conditions and the ability to use a wider variety of fuels as explained below, as well as the ability of [the Corps] to modify or condition its permit.  The necessity of this project as proposed and the appropriate range of alternatives are germane to NPS because different routing or project design could reduce adverse impacts to units of the National Park System and other special status areas under NPS administration.  NPS remains extremely concerned over the impacts the project as currently proposed would have on these units and special status areas and continues to advocate for preparation of an [EIS].  There are still clearly 'unresolved conflicts concerning alternative uses of available resources.'  An EIS would allow [the Corps] to assess the range of alternatives that would satisfy an accurate depiction of the need for the project.

Thus, NPS stated that new information and assumptions "call[] into question the analysis that Dominion and Stantec supplied to the [Corps] in their examination of the alternatives to the proposed action," and thus "[t]here are clearly other alternatives to be examined."

57.    In December 2016, NPS explained that in "repeated letters for well over a year," NPS had "made clear that the high degree of public controversy and major impacts to nationally significant resources raised by this project must trigger preparation of an EIS."  NPS also admonished the Corps for its lack of transparency under NEPA, including NPS's "deep concern over having no visibility at all on any draft documents [the Corps] may be preparing under NEPA."

58.    With the NHPA Section 106 process drawing towards its conclusion, NPS submitted perhaps its most critical comments concerning the project in January 2017.  At the outset, NPS advocated that the Corps deny Dominion's permit application: "NPS again unequivocally asserts that the impacts to the nationally significant and iconic historic resources affected by this project cannot be mitigated and urges the [Corps] to deny the permit request." Next, NPS criticized the lack of transparency and public involvement in the NEPA process, stating that "[w]e have seen no evidence of the initiation, much less completion, of any amount of analysis as required by NEPA," and the agency also "expressed deep concern over having no opportunity to review any draft documents [the Corps] may be preparing under NEPA."  In addition, NPS explained that the Corps had relinquished its statutory responsibility for this project by deferring to the desires of the permit applicant: "[r]epeatedly, the [Corps] has deferred to Dominion rather than completing the additional impact analysis the subject matter experts have requested."  Moreover, NPS attacked the Corps' (and Dominion's) refusal to seriously grapple with the myriad alternatives that would eliminate or avoid the project's impacts: "NPS

and other consulting parties have provided [the Corps] with multiple alternatives to the proposed

project which would truly avoid or minimize the impacts lo historic resources"; however,

"[f]rom the beginning of the process, without adequate analysis, viable alternatives were

dropped, which constrained the range of alternatives the [Corps] considered and therefore the

ability of [Corps] to modify or condition its permit."  NPS explained that "[t]he comments in this

letter should not come as a surprise to the Corps" because "NPS and other consulting parties

have commented countless times on the fundamental need for preparing an [EIS] for this

project."

59.     That same month, the Secretary of the Interior (the head of DOI) also submitted a

letter "to convey the Department of the Interior's substantial concerns about the proposed

Dominion Surry-Skiffes Creek-Whealton Transmission Line project."  Secretary Jewell

explained that the project will "introduce a major intrusion into a landscape that has been largely

unchanged since the earliest days of our Nation," "would cross directly over the open water route

of the Captain John Smith Chesapeake National Historic Trail; be within sight of Jamestown

Island and Colonial Parkway; set a precedent for additional development; and forever degrade

the historic setting of Colonial National Historic Park—a setting that has survived largely intact

for over 400 years."  As a result, DOI concluded that "[u]nfortunately, no mitigation measure can

effectively offset the impact to the landscape that the presence of the transmission line would

cause."  Secretary Jewell also explained that "[o]ther analyses conducted by the NPS and outside

stakeholders present legitimate questions about the project and identify the existence of viable

alternatives," which "leads us to the conclusion that an overhead power line is unsuitable at this

location."  The letter concluded with DOI's conclusion that "[i]f the [Corps] believes that the

permit cannot be denied on the current record despite the demonstrated significant impacts to

irreplaceable historic resources, the [Corps] should conduct an [EIS] . . . . to comprehensively explore the need for the project, investigate alternatives, and allow public scrutiny of the information and analysis upon which the [Corps] will make this momentous decision."

60.     In January 2017, CEQ also weighed in on the project.  In its letter, CEQ stated that "[t]he proposed power line would intrude on an area that remains relatively natural in appearance, with viewsheds that are nationally significant and warrant protection, and reminded the Corps that its "evaluation of the environmental effects of this proposal for Federal agency action necessarily includes analysis of historic, aesthetic, cultural, and related socioeconomic effects on Virginia's 'historic triangle.'"  CEQ, as the expert agency that administers NEPA, determined that the Corps "should evaluate the impacts of the Dominion . . . proposal, and alternatives, in an [EIS]."  CEQ explained that the Corps "must involve environmental agencies (including the National Park Service), the applicant, and the public" in any NEPA process and also must "analyze and consider alternatives that are called to its attention by other agencies, organizations, and communities" including "[c]redible alternatives that have been proposed by experts in the field of electricity transmission."

61.     After the January 2017 change in administrations, both DOI and CEQ (but not NPS) sent short letters to the Corps indicating that their prior concerns had been resolved despite the fact that the Corps had undertaken no new analysis of impacts or alternatives, nor had it prepared an EIS or involved the public by soliciting comment on any draft NEPA documents. These letters, which are devoid of any explanation as to how the Corps had in fact addressed the agencies' serious concerns, were politically motivated correspondence evidently seeking to bring the permit decisionmaking process to completion in favor of permit approval.

62.     Soon after receiving those letters from the new administration, the Corps, Dominion, and the consulting parties concluded the NHPA Section 106 process.  The Corps, Dominion, and some consulting parties signed an April 24, 2017 Memorandum of Agreement ("MOA") with respect to certain mitigation measures related to historic properties subject to the NHPA.  Plaintiff NPCA did not sign the MOA due to many unresolved issues and the fact that the mitigation adopted will not lessen the significance of the permanent impacts to irreplaceable and nationally significant parks and historic properties.  NPS itself did not sign the MOA, but a DOI official purportedly signed on NPS's behalf.

### C.     The Surry-Skiffes Creek-Whealton Permit, EA, FONSI, and CWA Section 404 Statement of Findings

63.     On July 3, 2017, the Corps issued a permit to Dominion under the CWA and the Rivers and Harbors Act to construct and operate the Surry-Skiffes Creek-Whealton project in a functionally identical configuration to the one contemplated in Dominion's original permit application.  On July 6, 2017, the Corps notified the public of permit issuance by posting the permit and accompanying environmental reviews on the agency's website.

64.     According to the permit, the project approved by the Corps will consist of three components: (1) a 7.92-mile overhead transmission line, which includes a 4.11-mile crossing of the James River and the construction of seventeen in-river steel lattice towers up to 295 feet tall; (2) a new switching station; and (3) a 20.2-mile overhead transmission line from the new switching station to an existing substation.

65.     In a separate document accompanying the permit, the Corps prepared an EA, FONSI, and CWA Section 404 Statement of Findings.  Despite repeated calls from NPS, DOI, CEQ, Plaintiff NPCA, and others to prepare an EIS due to the indisputable significance of project impacts and the need to extensively examine feasible project alternatives that could

eliminate or at least reduce those impacts, the Corps refused to prepare an EIS. The Corps'
FONSI—i.e., its legally required documentation of its reasons for not preparing an EIS—is a
mere four paragraphs that fails even to analyze the ten enumerated "significance" factors that the
NEPA regulations demand agencies evaluate before they can determine that an EIS is not
required. Not only does the cursory FONSI fail to evaluate each of the significance factors, but
the Corps also inexplicably stated that "the general environmental impacts of this project are
minimal." Based on the FONSI, the Corps evidently believes that introducing industrial
development onto the physical landscape is not an environmental impact but rather a "cultural
impact" that is either not subject to NEPA, or cannot constitute a significant impact triggering
preparation of an EIS. Thus, the basis upon which the Corps determined that an EIS is not
legally required is "[b]ecause the effects of greatest concern are subjective."

66.     With respect to evaluating project impacts, the Corps gave short shrift to the
irreversible and substantial impacts that will permanently degrade the integrity, conservation,
atmosphere, and experience of the affected national park units and historic properties, as well as
the adverse impacts that the millions of annual visitors to this region will experience. By once
again deeming these impacts "subjective," and thereby downplaying the significance of these
impacts as repeatedly determined by NPS, other federal agencies, and the public, the Corps
failed to seriously grapple with the import of these impacts on the natural landscape and the
many Americans who visit this region. Remarkably, the Corps determined in the EA that "the
project will intrude upon the viewsheds of historic properties and on a unique and highly scenic
section of the James River" where the landscapes are "impressive and historically significant"
thus constituting "a national treasure," but failed to reconcile those statements with the Corps'
treatment of those issues in the EA or its failure to prepare an EIS.

67.     The EA also failed to take a hard look at other project impacts.  For example, the Corps failed to analyze the serious economic consequences of this project despite repeated determinations by NPS and others that this project will detrimentally affect the regional economy, jobs, and the local tax base as fewer visitors attend these parks and properties due to the introduction of an industrial transmission line and towers that are incompatible with these parks and properties—critical socioeconomic issues that the Corps hardly addressed.  Relatedly, the EA cursorily dismissed NPS's determination that project approval will likely jeopardize NPS's efforts to obtain a UNESCO World Heritage Site designation—which would eliminate the potential for countless annual visitors and millions of dollars of economic revenue to be generated for local communities—by asserting that such a designation was unlikely.  In addition, despite concerns over project construction stirring up sediment in the James River laden with the highly toxic pollutant kepone that would contaminate the river and negatively affect fish and other wildlife, the Corps dismissed such concerns by concluding, without analysis, that "there will be no effect caused by disturbance of the river bottom that would reintroduce any contamination into the water column."  Moreover, despite acknowledging that the National Marine Fisheries Service will soon be designating this stretch of the James River as formal critical habitat for the federally protected Atlantic sturgeon—habitat that is necessary to ensure this species' long-term survival and recovery—the EA did not sufficiently analyze the project's construction and operation impacts to the sturgeon, its critical habitat, or its prospects for survival and recovery.

68.     With respect to alternatives, the EA listed more than a dozen alternatives the Corps considered, but the Corps provided very little detail about any of the alternatives and even less analysis as to their feasibility under current conditions at the time of permit issuance in July

2017.  The Corps cursorily dismissed as impracticable all alternatives that did not involve an overhead transmission line—including those alternatives developed and extensively analyzed by independent experts such as Princeton Energy Group International and Tabors Caramanis Rudkevich—based solely or primarily on construction costs or construction timing.  The EA does not provide any analysis as to how the Corps reached its determinations concerning costs or timing for each alternative, nor does the alternatives analysis factor in other economic benefits or costs of alternatives outside of project construction (e.g., impacts or benefits to the regional economy and local tax base).  The EA's alternatives analysis appears to be based largely on Dominion's responses to comments during the NHPA Section 106 process concerning alternatives, rather than any independent analysis by the Corps.

69.     In preparing and issuing its EA and FONSI, the Corps went out of its way to avoid public participation and involvement.  Despite repeated calls from federal agencies, Plaintiff NPCA, and others to provide more (or at least some) transparency during the NEPA process, the Corps failed to solicit public comment on a draft EA and FONSI.  Notwithstanding the major precedent that will be set by the Corps' decision, the major impacts to irreplaceable national treasures, and the need to scrutinize all feasible alternatives to the project, the Corps never shared any drafts of its EA or FONSI with the public or requested feedback from the agency that would be most heavily impacted by this project (NPS).  Instead, federal agencies and the public first learned about the Final EA and FONSI on July 6, 2017 when the Corps posted it on its website along with the finalized permit, meaning that it was too late for federal agencies or the public to play any meaningful role in the NEPA process by providing pertinent information that might influence the decisionmaking process.

70.     In the same document as the EA and FONSI, the Corps provided its CWA Section 404 Statement of Findings.  In its Section 404 "public interest" review, the Corps determined, without explanation, that any detrimental impacts of the project would be "minimal and permanent."  On the basis of that determination (among others), the Corps concluded that "the proposed project is not contrary to the public interest."

71.     The Corps also determined in its CWA Section 404 Statement of Findings that the proposed project "is the least environmentally damaging practicable alternative," as required by the CWA and its implementing regulations.  However, in the Corps' analysis of alternatives (which is the same alternatives analysis for NEPA purposes), the Corps failed to determine the relative environmental benefits and impacts of each alternative in comparative form, and thus failed to identify the least environmentally damaging alternative as required by the CWA. Rather, the Corps cursorily eliminated many alternatives as impracticable—without any determination as to their relative environmental benefits as compared to the proposed project, or even any attempt to quantify those benefits to determine whether they counterbalance the increased costs or construction time for such alternatives—thereby focusing on the practicability analysis at the expense of the least environmentally damaging analysis that must come first. Moreover, in deeming all non-overhead transmission lines alternatives impracticable, the Corps relied primarily on construction costs or timing without providing any analysis as to how those financial and timing figures were determined.  In addition, with respect to costs, the Corps examined costs only through the narrow lens of project construction costs, but failed to take into account the myriad economic consequences of the project on the regional economy and local tax base as compared to the significant economic benefits that many alternatives would provide.

72.     Because the Corps' permit represents federal authorization for this project to proceed, Dominion may begin construction immediately.  Upon information and belief, Dominion intends to imminently commence construction of this project.

## PLAINTIFF'S CLAIMS FOR RELIEF

### Claim 1 – Violations of NEPA

73.     This First Claim for Relief challenges Defendants' violations of NEPA and its implementing regulations in authorizing the permit, EA, and FONSI.  Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.  Defendants violated NEPA and its regulations in multiple respects through issuance of the challenged permit, including but not limited to the following.

74.     By failing to prepare an EIS despite overwhelming evidence and determinations by sister federal agencies that this project will result in myriad irreversible environmental, aesthetic, historic, cultural, safety, wildlife, and socioeconomic impacts to our nation's most vitally important national park units and historic properties dedicated to our country's founding, the Corps violated NEPA and its regulations.  In addition, by failing to analyze—let alone determine—whether any NEPA "significance" factors enumerated at 40 C.F.R. § 1508.27(b) are implicated by this project, the Corps acted in contravention of NEPA and its regulations.  In any event, because several significance factors are indisputably implicated by this precedential and highly controversial project that will introduce a massive industrial structure into a relatively pristine setting (e.g., causing significant impacts to historic and cultural resources, park lands, sites eligible for listing in the National Register of Historic Places, and federally protected wildlife species), and thereby substantially and permanently degrade its historic, cultural, and environmental integrity, the Corps' failure to prepare an EIS violates NEPA and its regulations.

Finally, the Corps' refusal to prepare an EIS on the basis that the permit applicant (Dominion) desired to avoid the more rigorous EIS process was arbitrary and capricious because the Corps improperly delegated its statutory obligation to determine the necessity of an EIS to a self-interested, non-federal third party, rather than make an independent agency determination as required by NEPA.  For all of these reasons, the Corps' failure to prepare an EIS violates NEPA and its regulations, and is arbitrary and capricious and "without observance of procedure required by law" in contravention of the APA.  5 U.S.C. § 706(2).

75.     By failing to take a "hard look" at the irreversible and substantial impacts of this project on environmental, recreational, aesthetic, historic, and cultural resources in this nationally significant region—and instead dismissing these impacts as "subjective" and therefore insignificant—the Corps violated NEPA and its regulations.  The Corps' failure in the EA and FONSI to adequately document the level of controversy over this project, and in particular, the failure to address the longstanding and repeated determinations by its sister agency (NPS) that the lands and resources administered by NPS will, in fact, be permanently and significantly degraded by this project, further undermine the NEPA process in violation of federal law. Indeed, the Corps failed even to reconcile its own conclusions that this area constitutes a "national treasure" and that "the project will intrude upon the viewsheds of historic properties and on a unique and highly scenic section of the James River" where the landscapes are "impressive and historically significant," while at the same time concluding, with little explanation, that there would be only minor impacts associated with the project.  With respect to other impacts—such as socioeconomic concerns over the project's loss of tourism and economic revenue for the regional economy and local tax base, the project's risks to UNESCO World Heritage Site designation of Jamestowne or registration of additional regional properties on the

National Register of Historic Places and/or the Virginia Landmarks Register (and the consequent economic impacts of such designations), the project's potential to stir up contaminant-laden (kepone) waters in the James River with detrimental wildlife impacts, the project's potential impacts to the federally protected Atlantic sturgeon and its critical habitat, and the potential health and safety risks to kayakers and other recreational visitors—the Corps provided little, if any, explanation in summarily dismissing these issues from analysis in the EA, also in violation of NEPA and its regulations.  For all of these reasons, the Corps' failure to take a hard look in the EA and FONSI at the direct, indirect, and cumulative impacts of this project violate NEPA and cannot pass muster under the APA.

76.     By failing to adequately analyze project alternatives that would eliminate or at least substantially reduce project impacts—including several alternatives researched and developed by independent experts on electricity transmission—the Corps violated NEPA and its regulations.  In particular, by providing the public with little detail about project alternatives in its EA and FONSI, while at the same time cursorily dismissing all non-overhead transmission line options as impracticable, the Corps did not take the hard look required by NEPA nor did the Corps "sharply defin[e] the issues and providing a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.  The EA does not provide any analysis as to how the Corps reached its determinations concerning costs or timing for each alternative, nor does the alternatives analysis factor in other economic benefits or costs of alternatives outside of project construction (e.g., impacts or benefits to the regional economy or local tax base), which unlawfully narrowed the Corps' alternatives analysis in a manner inconsistent with NEPA.  By largely deferring to Dominion's treatment of alternatives during the NHPA Section 106 process, the Corps failed to independently analyze project alternatives in an objective manner that

40

promotes NEPA's underlying purposes.  For all of these reasons, the Corps' alternatives analysis in the EA violates NEPA and its regulations, and is arbitrary, capricious, and without observance of procedure required by law.

77.     By refusing to involve the public and other federal agencies in the NEPA process—despite repeated calls from Plaintiff NPCA, NPS, DOI, CEQ, and other stakeholders to provide enhanced (or any) transparency of the NEPA process—the Corps violated NEPA and its regulations.  In particular, by failing to circulate any draft EA or FONSI for at least a 30-day public comment period so that federal agencies, electricity transmission experts, and members of the affected public could provide crucial input on project impacts, feasible project alternatives, and the need for an EIS, the Corps violated NEPA's public disclosure and involvement requirements, as well as 40 C.F.R. § 1501.4(e)(2), which requires a 30-day comment period under these circumstances, *id.*; *see also* 46 Fed. Reg. 18,026, 18,037.  For all of these reasons, the Corps' failure to involve the public in the NEPA process—through issuance of a draft EA and FONSI for public comment or otherwise meaningfully involving the public in this highly controversial project—subverted the NEPA process and rendered it arbitrary, capricious, and without observance of procedure required by law.

## Claim 2 – Violations of the CWA

78.     This Second Claim for Relief challenges Defendants' violations of the CWA and its implementing regulations in authorizing the permit and the CWA Section 404 Statement of Findings.  Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.  Defendants violated the CWA and its regulations in multiple respects through issuance of the challenged permit, including but not limited to the following.

79.     By determining that this project is in the public interest—despite unparalleled

controversy and repeated determinations from the agency (NPS) with jurisdiction over the

federal lands and resources that will be impacted by the project that these impacts will result in

"unacceptable" impairment to nationally significant park units and historic properties and

resources located therein—the Corps violated the CWA and acted arbitrarily and capriciously.

In addition, the Corps' determination that the project "is not contrary to the public interest" based

on the erroneous and unexplained assertion that any detrimental impacts would be "minimal"

cannot be squared with extensive evidence submitted to the Corps concerning the unprecedented

and substantial risks posed by this project to these exceptionally unique national treasures.  For

these reasons, the Corps' determination in its CWA Section 404 Statement of Findings that this

project is not contrary to the public interest violated the CWA and is arbitrary and capricious.

80.     By determining in its CWA Section 404 Statement of Findings that the proposed

overhead transmission line is the least environmentally damaging practicable alternative, the

Corps violated the CWA and its regulations.  The Corps' failure to determine—let alone

analyze—the comparative benefits and impacts of each alternative in its Statement of Findings,

and the Corps' consequent failure even to identify the least environmentally damaging

alternative, violated the CWA and its regulations.  In addition, the Corps' practicability analysis

to the exclusion of any least environmentally damaging alternative analysis violated the CWA by

making this legal determination based on construction costs and timing, rather than accounting

for the relative environmental damage and benefits of each alternative.  Moreover, by failing to

consider all economic costs and benefits of each alternative in the practicability analysis—and

excluding from consideration the substantial economic benefits that non-overhead transmission

line alternatives will bring to the regional economy and local tax base—the Corps unduly

narrowed the practicability analysis in violation of the CWA.  To the extent the Corps considered the practicability of alternatives, the Corps failed to provide any analysis as to how it determined the respective financial and timing figures for each alternative or how it determined, compared to the baseline of the proposed project, what constitutes practicability for purposes of construction costs or timing for this specific project.  By delegating the statutorily required federal agency determination as to the least environmentally damaging practicable alternative to a non-federal third party with a vested interest in permit approval—rather than independently analyzing this issue and making its own determination—the Corps also violated the CWA.  For all of these reasons, the Corps' least environmentally damaging practicable alternatives analysis in the CWA Section 404 Statement of Findings violated the CWA, and was arbitrary, capricious, and adopted without observance of procedure required by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)    Declare that the Corps' decision to authorize construction and operation of the Surry-Skiffs Creek-Whealton Project as described herein violates NEPA, the CWA, and the APA;

(2)    Set aside and remand the challenged permit, EA, FONSI, and CWA Section 404 Statement of Findings consistent with the requirements of NEPA, the CWA, and the APA;

(3)    Enjoin Defendants from authorizing project construction and operation until they have fully complied with all of their obligations under NEPA, the CWA, and the APA;

(4)    Award Plaintiff its reasonable attorneys' fees and costs; and

(5)    Grant Plaintiff such other and further relief that the Court may deem is just and proper.

43

Respectfully submitted this 12th day of July, 2017.

*/s/ William S. Eubanks II*
William S. Eubanks II
D.C. Bar Number 987036
Meyer Glitzenstein & Eubanks LLP
2601 S. Lemay Avenue
Unit 7-240
Fort Collins, CO 80525
(970) 703-6060
(202) 588-5049 (fax)
beubanks@meyerglitz.com

*/s/ Eric R. Glitzenstein*
Eric R. Glitzenstein
D.C. Bar Number 358287
Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Avenue NW
Suite 210
Washington, DC 20016
(202) 588-5206
(202) 588-5049 (fax)
eglitzenstein@meyerglitz.com

*/s/ Elizabeth Lewis*
Elizabeth L. Lewis
(pro hac vice application pending)
Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Avenue NW
Suite 210
Washington, DC 20016
(202) 588-5206
(202) 588-5049 (fax)
llewis@meyerglitz.com