NATIONAL PARKS CONSERVATION
ASSOCIATION,

    Plaintiff,

    v.

TODD T. SEMONITE, *Lieutenant General, U.S Army Corps of Engineers* and ROBERT M. SPEER, *Acting Secretary of the Army*

    Defendants,

VIRGINIA ELECTRIC AND POWER
COMPANY,

    Defendant-Intervenor.

Civil No. 17-CV-01361-RCL

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED STATES
and ASSOCIATION FOR THE
PRESERVATION OF THE VIRGINIA
ANTIQUITIES

    Plaintiff,

    v.

TODD T. SEMONITE, *Lieutenant General, U.S Army Corps of Engineers* and ROBERT M. SPEER, *Acting Secretary of the Army*

    Defendants,

VIRGINIA ELECTRIC AND POWER
COMPANY,

    Defendant-Intervenor.

Civil No. 17-CV-01574-RCL

1

## MEMORANDUM OPINION

Before the Court are plaintiff National Parks Conservation Association's ("NPCA's") Motion for Summary Judgment (17-cv-01361, ECF No. 68); plaintiffs National Trust for Historic Preservation in the United States' ("National Trust") and Association for the Preservation of Virginia Antiquities' ("Preservation Virginia") Motion for Summary Judgment (17-cv-01574, ECF No. 53); federal defendants' and defendant-intervenor Virginia Electric & Power Company's ("Dominion") Cross-Motions for Summary Judgment (filed in both cases); and all responses and replies thereto. Plaintiffs in both cases bring claims under the National Environmental Policy Act and Section 404 of the Clean Water Act. Plaintiffs National Trust and Preservation Virginia also allege a violation of the National Historic Preservation Act. Given the substantially similar nature of the cases, the Court will address all the above motions in this opinion. Upon careful consideration of the parties' filings, the administrative record, and the applicable law, the Court will **DENY** the plaintiffs' Motions for Summary Judgment and will **GRANT** federal defendants' and defendant intervenor's Cross-Motions for Summary Judgment in their entirety.

## I.    BACKGROUND

### A. Statutory and Regulatory Framework

#### 1.  The National Environmental Policy Act

The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*, "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (*quoting* 42 U.S.C. § 4321). "[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes

the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). The goal of NEPA is to "prohibit[] uninformed—rather than unwise—agency action." *Id.* at 351. It "is an 'essentially procedural' statute intended to ensure 'fully informed and well-considered' decisionmaking, but not necessarily the best decision." *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978)). The Council on Environmental Quality ("CEQ") promulgates regulations that guide federal agencies' compliance with NEPA. 40 C.F.R. §§ 1500.1-1508.28.

At the heart of NEPA is the requirement that federal agencies prepare a detailed statement—an Environmental Impact Statement (EIS)—in connection with "proposals for ... major Federal actions *significantly affecting* the quality of the human environment." 42 U.S.C. § 4332(C) (emphasis added). Among other requirements, an EIS must include an explanation of "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)-(iii). The Supreme Court has highlighted that an EIS is meant to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349.

If an agency is unsure if an EIS is required (i.e. it is unsure if the proposed project will have a *significant effect* on the human environment), it may prepare an Environmental Assessment ("EA") to assist in making that decision. 40 C.F.R. § 1501.3-4. The regulations define an EA as a "concise public document" in which the agency must "briefly" discuss "the environmental

3

impacts" and "alternatives" to the proposed action. 40 C.F.R. § 1508.9. If the agency determines upon completing an EA that an EIS is not necessary, it must issue a Finding of No Significant Impact ("FONSI") in which it "briefly present[s] the reasons why an action ... will not have a significant effect on the human environment." 40 C.F.R. § 1508.13. At issue in this case is the Corps' FONSI determination and its decision not to prepare an EIS.

### 2. The Clean Water Act

The Clean Water Act ("CWA") was enacted "to restore and maintain chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a). The statute prohibits the "discharge of any pollutant by any person" except as authorized by the statute or by a permit granted by the Corps pursuant to Section 404 of the Act, by the Environmental Protection Agency ("EPA"), or by an authorized State. *Id.* § 1311(a); *see also id.* § 1344. The Environmental Protection Agency, together with the Corps, developed guidelines to implement the policies of the CWA and the Corps is required to follow these guidelines in deciding whether to issue a Section 404 permit. *See* 33 U.S.C. § 1344(b); 40 C.F.R. § 230.2.

In deciding whether to grant a permit pursuant to Section 404, the Corps must conduct a "Public Interest Review." 33 C.F.R. § 320.4(a). The Corps evaluates the "probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.* at 320.4(a)(1). The Corps must carefully weigh the benefits of the proposed action against the "reasonably foreseeable detriments." *Id.* The guidelines list numerous factors for the Corps to consider, including conservation, economics, aesthetics, general environmental concerns, historic properties, navigation, recreation, energy needs, safety, and the needs and welfare of the people. *Id.* Unless the proposal is determined to "be contrary to the public interest," a permit will be granted. *Id.*

4

The Corps must also consider if there is a "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

### 3. *National Historic Preservation Act*

As explained by the D.C. Circuit, the purpose of the National Historic Preservation Act ("NHPA") is to "discourag[e] federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control." *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C. Cir. 1989). In service of this goal, Section 106 of the NHPA mandates that federal agencies "shall take into account the effect of the undertaking on any historic property" and must provide the Advisory Council on Historic Preservation ("ACHP") with an opportunity to comment on the undertaking. 54 U.S.C. § 306108. Regulations promulgated by the ACHP lay out a procedure for the federal agency to follow in order to comply with the NHPA. 36 C.F.R. §§ 800.3-800.6. The consultative process typically commences with an executed memorandum of agreement outlining "how the adverse effects will be resolved." *Id.* § 800.6(b)(iv).

Section 110 was added to the NHPA by Congress in 1980 and stipulates that before commencing a federal undertaking that may "directly and adversely affect" a National Historic Landmark, agencies shall take "shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107. At issue in this case is whether Section 110 applies and whether the Corps met its obligation under the statute.

### B. Relevant Factual and Procedural Background

This dispute arises out of a planned electrical infrastructure project in Virginia, known as the Surry-Skiffes Creek-Whealton Project ("Project"). The Project consists of three components:

5

(1) a new 500kV overhead transmission line across the James River from Surry to Skiffes Creek, (2) a new electrical switching station at Skiffes Creek, and (3) a new overhead transmission line from Skiffes Creek to Whealton. Defendants posit that the project is essential in order to improve the electrical infrastructure and provide reliable electric service to the Hampton Roads region of Virginia. Plaintiff's interest in this case lies in the first component of the project, the river crossing, which involves approximately 7.92 miles of overhead transmission line. Approximately 4.11 miles of the line will cross the James River through, and in close proximity to, numerous historically significant sites dating back to the birth of our Nation: the Captain John Smith Trail, the Jamestown-Hog Island-Captain John Smith Trail Historic District, Jamestown Island, the Colonial Parkway, Colonial National Historical Park, and Carter's Grove National Historic Landmark. The river crossing will entail the construction of seventeen towers across the James River. Four of the towers will stand up to 295 feet tall, with the remaining 14 standing approximately 189 feet above the water level.

In early 2013, defendant-intervenor Dominion sought Corps approval for the Project. Dominion initially asked for approval under Nationwide Permit 12, which authorizes activities that cause minimal impact and would not require any individualized analysis under NEPA or the CWA. However, the Corps determined that a standard individual permit review was more appropriate and requested additional information on the Project from Dominion. After receiving additional information from Dominion on the contours of the Project and the need for electrical infrastructure in the region, the Corps issued a public notice in August 2013 initiating the permitting process and soliciting comments from the public, government agencies, and Native American tribes. The Notice indicated that "[a]ny comments received will be considered by the Corps [] to determine whether to issue, modify, condition or deny a permit for this proposal."

AR0149954. It further noted that comments would be "used to assess impacts on endangered species, historic properties, water quality, general environmental effects," and other factors in order to prepare an EA and/or EIS. *Id*. Finally, the Corps stated that a preliminary review indicated that an EIS would not be required, though additional information might change their assessment. In response to the notice, the Corps received comments expressing concern with the Project's proximity to historic sites—including from the National Parks Service ("NPS"), a sister government agency. NPS, among others, believed that the impacts of the project would be significant and that an EIS was required.

Following release of the initial public notice of the Project, the Corps undertook dual-track processes to evaluate the Project: (1) the consultation process required under Section 106 of the NHPA and a (2) NEPA process to determine the environmental impacts and feasible alternatives. Plaintiffs in these cases participated in the processes and provided the Corps with feedback and analysis throughout. At this point in the opinion, the Court will not detail each and every piece of feedback that the Corps received nor the measures that the Corps took to respond to the feedback. The Court will discuss the relevant details as necessary during its analysis.

In May 2017, the Corps; Dominion; and the Acting Assistant Secretary of Interior for Fish, Wildlife, and Parks (on behalf of NPS), among other parties, signed a Memorandum of Agreement ("MOA"). The MOA, developed through the Section 106 consultation process, contained stipulations to avoid, minimize, and mitigate adverse impacts to the historical sites in proximity to the proposed Project. In June 2017, the Corps signed and released a document entitled Memorandum for the Record ("MFR"). The MFR, a 111-page document, includes an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI") as required under NEPA, and a Section 404 Statement of Findings as required under the Clean Water Act

("CWA"). And on July 3, 2017, the Corps issued the permit to Dominion authorizing the portions of the Project under Corps jurisdiction, subject to compliance with the MOA (among other conditions).

Plaintiffs, all non-profit organizations, subsequently brought suit in this Court and moved for preliminary injunctions on their claims. In one action, plaintiff NPCA alleges violations of NEPA and the CWA. *See* 17-cv-1361. In the other action, plaintiffs National Trust for Historic Preservation in the United States and Association for the Preservation of Virginia Antiquities allege violations of NEPA, the NHPA, and the CWA. *See* 17-cv-1574. On September 20, 2017, the Court heard oral arguments on the Motions for Preliminary Injunction. The Court denied both motions, finding that the plaintiffs failed to establish a likelihood of irreparable harm prior to the cases being decided on the merits. The plaintiffs subsequently filed motions for summary judgment on their claims and defendants and defendant-intervenors filed cross-motions for summary judgment. The Court now considers those motions.

## II. STANDARD OF REVIEW

Although plaintiffs, defendants, and the defendant-intervenor filed cross-motions for summary judgment, the standard set forth in Federal Rule of Civil Procedure 56—which requires the Court to grant summary judgment when there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law"—does not apply to this case. See *Stuttering Found. of Amer. v. Springer*, 498 F.Supp.2d 203, 207 (D.D.C.2007). Rather, the case is properly reviewed under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. Upon review of the administrative record, the Court may only "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Courts find agency actions arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 574 (D.C. Cir. 2016) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997–98 (D.C. Cir. 2008); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Courts examine whether the agency engaged in "reasoned analysis." *Id.* at 57. An agency has engaged in "reasoned analysis" if the record demonstrates that "it examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* at 43.

As to the plaintiffs' NEPA claims, the Court will consider only whether the Corps followed the procedural requirements set out by the statute in preparing the EA and issuing a FONSI for the Project, and not whether the Corps reached the right substantive result in deciding to grant the permit. The D.C. Circuit has highlighted that "because the statute directs agencies only to look hard at the environmental effects of their decisions, and not to take one type of action or another, federal judges [must] correspondingly enforce the statute by ensuring that agencies comply with NEPA's procedures, and not by trying to coax agency decisionmakers to reach certain results." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (citing *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97–98 (1983).

## III.  ANALYSIS

### A. The Corps' Compliance with NEPA

Plaintiffs in both cases before the Court challenge the Corps' actions under NEPA and raise an array of arguments in support of their claims.  For the sake of clarity, the Court buckets the plaintiffs' arguments into three main categories: (1) that the Corps erred in deciding to issue a FONSI and not an EIS; (2) that the Corps failed to adequately analyze less impactful feasible alternatives; and (3) that the Corps failed to provide the opportunity for public comment or meaningful involvement in the NEPA process.  The Court will address each set of arguments in turn and find that the Corps complied with its NEPA obligation.  Although at the preliminary injunction phase of this case the Court noted that the plaintiffs made a powerful argument on the merits,[1] now that the Court has dug in to the administrative record and relevant case law it is evident that the Corps made a "fully informed and well-considered" decision.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978).  It is not the Court's role to overturn agency action in this context simply because it might have reached a different outcome on the substantive issue.  *Id.*

### 1.  Decision to Issue a FONSI and Forego an EIS

As the Court set out above, an EIS is only required when a major federal action will "significantly affect" the quality of the human environment.  The D.C. Circuit recently reiterated that a court's role in "reviewing an agency's decision not to prepare an EIS is a limited one, designed primarily to ensure that no arguably significant consequences have been ignored."  *Mayo*

---

[1]      At that time, the Court did not rule on the merits prong of the preliminary injunction test because it found that the plaintiffs had not "established a likelihood of any irreparable harm and failure to show any irreparable harm is [] grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  17-cv-1574, ECF No. 45 at 5; 17-cv-1361, ECF No. 60 at 5 (internal citation omitted).

*v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017). Courts in this Circuit apply a four-factor test when reviewing whether an agency properly issued a FONSI. Court's assess whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011). The D.C. Circuit makes clear that although the phrase "convincing case" (found in factor three above) has appeared in the case law, the scope of review is the usual one for reviewing administrative action—"arbitrary, capricious, or an abuse of discretion." *Id*.

In order to satisfy the "hard look" requirement, the agency must ensure that the "adverse environmental effects of the proposed action are adequately identified and evaluated." *Robertson*, 490 U.S. at 350. The regulations issued by the Council on Environmental Quality further elucidate how to evaluate whether the proposed project will significantly impact the human environment. The Council explains that "*[s]ignificantly* as used in NEPA requires considerations of both context and intensity." 40 C.F.R. § 1508.27. "Context" refers to the fact that the action must be "analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." *Id*. . § 1508.27(b). And "intensity" refers "to the severity of impact." *Id*. The regulations then proceed to identify the following ten "significance factors" that should be considered in evaluating intensity:

> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
>
> (2) The degree to which the proposed action affects public health or safety.

11

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10)    Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*Id.* § 1508.27(b).

### i.    Significance Factors

Plaintiffs contend that the record makes clear that several of the CEQ significance factors are implicated in this case, demonstrating that the Corps failed to take a hard look at the problem and failed to make a convincing case of no significant impact.  As a threshold matter, the parties disagree as to whether a Court must order an EIS if only one of the significance factors is determined to be present.  Plaintiffs suggest that the "existence of even a single significance factor

12

requires preparation of an EIS." 17-cv-1361, ECF No. 68-1 at 25 (citing *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 218-19 (D.D.C. 2003) ("[T]he presence of one or more of these factors should result in an agency decision to prepare an EIS."); *Humane Soc'y v. Johanns*, 520 F. Supp. 2d 8, 20 (D.D.C. 2007) (same); *Ark Initiative v. Tidwell*, 64 F. Supp. 3d. 81, 99 (D.D.C. 2014) (same). Defendants respond that the implication of a single significance factor does not require an EIS and that the factors are not to be interpreted as categorical rules; rather "the agency must consider the potential significance of the effects of its action in light of the intensity of each factor." 17-cv-1361, ECF No. 76-1 at 37 (citing *Van Antwerp*, 661 F.3d at 1154-55 (affirming decision by Corps not to prepare EIS based on evaluation of relevant significance factors); *see also Advocates For Transp. Alternatives, Inc. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 301-08 (D. Mass. 2006) (affirming Corps' decision not to prepare an EIS after considering relevant significance factors)). The Court need not address this dispute, however, as the Court finds that none of the significance factors weigh in favor of plaintiffs' contention that an EIS is required. The Court will proceed to analyze each of the significance factors highlighted by the plaintiffs.

*a. Highly Controversial*

Plaintiffs strenuously contest that the effects of the Project are highly controversial. Under the regulations, the Court must consider whether "the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Plaintiff NPCA argues that "[t]he record in this case presents a textbook example of highly controversial project under NEPA," citing the fact that NPS and others with expertise have repeatedly disputed the conclusions reached by the Corps and the scientific methodologies employed by the Corps and Dominion to assess the impacts of the Project. 17-cv-1361, ECF No. 68-1 at 26.

The D.C. Circuit has clearly indicated that controversy in this context is not measured merely by the intensity of the opposition. Rather, "[t]he term 'controversial' refers to cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." *Town of Cave Creek, Arizona v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *Found. for N. Am. Wild Sheep v. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982)). Courts in this circuit have found that "something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter." *Nat'l Parks Conservation Ass'n v. United States*, 177 F.Supp.3d 1, 33 (D.D.C. 2016) (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975)).

And that "[m]any courts have found 'something more' to be scientific or other evidence that reveals flaws in the methods or data relied upon by the agency in reaching its conclusions." *Id.* (citing *Nat'l Parks & Conservation Assoc. v. Babbitt*, 241 F.3d 722, 736–37 (9th Cir. 2001) (holding agency action was highly controversial because "comments urg[ing] that the EA's analysis was incomplete, and the mitigation uncertain, ... cast substantial doubt on the adequacy of the Parks Service's methodology and data," and thus the dispute went "beyond a disagreement of qualified experts over the 'reasoned conclusions' as to what the data reveal[ed]"); *Nat'l Wildlife Fed'n v. Norton*, 332 F.Supp.2d 170, 185 (D.D.C. 2004) ("Such a controversy exists where the Corps is presented with scientific evidence specifically evaluating the environmental effects of the proposed project or calling into question the adequacy of the EA."); *Fund for Animals v. Norton*, 281 F.Supp.2d 209, 235 (D.D.C. 2003) ("While plaintiffs have identified serious gaps in defendants' assessment of the local effects of the proposed action, they do not appear to have identified any scientific controversy *per se* as to the extent of the effects."); *Sierra Club v. Van Antwerp*, 719 F.Supp.2d 58, 67–68 (D.D.C. 2010) ("While

declarations were submitted to the Corps from numerous experts who claimed that [the development project] will have significant adverse impacts on Cypress Creek and its wetlands, these declarations alone fail to rise to the level of 'controversy' under NEPA."), *aff'd in part, rev'd in part on other grounds*, 661 F.3d 1147 (D.C. Cir. 2011), *as amended* (Jan. 30, 2012)); *but cf. Humane Soc. of U.S. v. Dep't of Commerce*, 432 F.Supp.2d 4, 19–20 (D.D.C. 2006) (finding agencies' decision not to prepare EIS highly controversial based on comments from plaintiff and other agencies indicating disagreement with agencies' conclusions); *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F.Supp.3d 101, 127 (D.D.C. 2017).

Applying this standard, the Court finds that the Project is not highly controversial. The record is certainly replete with examples of NPS expressing its view that the project is highly controversial and that the Corps must undertake an EIS. From the Corps' first public notice of the Project in 2014, NPS raised concerns both about the level of impact that the Project would create and the methodologies employed by the Corps and Dominion in evaluating the Project. For instance, NPS noted that "[t]he high degree of scientific/expert controversy and major impacts to nationally significant resources raised by this project must trigger preparation of an EIS." AR 6015. Along those lines, NPS expressed that "[t]he visual impacts of the proposed project are already highly controversial as demonstrated by opposition from several stakeholder organizations in addition to strenuous opposition from NPS." AR 24094.

NPS was not alone in its opposition to the project and its belief that an EIS was necessary under NEPA. The Advisory Council on Historic Preservation ("ACHP") and CEQ independently raised concerns at various points over the years. *See* 16-cv-1361, ECF No. 68-1 at 14-16. Moreover, Secretary of the Interior Jewell sent a letter to the Corps in January 2017—her final month in office before the change in administration—stating in no uncertain terms the Department

of Interior's "substantial concerns" with the Project. AR5920. She noted that the Project "introduce[s] a major intrusion into a landscape that has been largely unchanged since the earliest days of our Nation" and that "no mitigation measure can effectively offset the impact to the landscape that the presence of the transmission line would cause." *Id.* Secretary Jewell highlighted that "[o]ther analyses conducted by NPS and outside stakeholders present legitimate questions about the project and identify the existence of viable alternatives" and that "NPS has also conducted assessments of socioeconomic impacts, landscape scale and viewshed impacts, and Dominion's mitigation proposal." *Id.* She noted that the Department concluded, based on that analysis, "that an overhead power line is unsuitable at this location." *Id.* Secretary Jewell further stated that should the Corps still believe granting a permit is warranted, it should conduct an EIS beforehand. *Id.*

Finally, a visual impact analysis expert from the Argonne National Laboratory also addressed what he viewed to be insufficient analysis performed by the Corps and Dominion. He noted that "[n]o analysis of the aesthetic impacts of the proposed project has been conducted, thus the requirements of NEPA are unmet." AR 6074. According to the Argonne experts, the Corps improperly substituted a "cultural resource analysis" for a "visual resource analysis" and therefore improperly analyzed the impact from the Project. AR 6071-72.

These excerpts from the administrative record highlight the vociferous opposition to the Project. And the opposition was not limited to differences in opinion related to the level of impact from the Project. NPS, and others, raised methodological concerns with the Corps' and Dominion's analysis. *See Nat'l Parks Conservation Ass'n*, 177 F.Supp.3d at 33 (finding that for a project to be "highly controversial" there must be identified flaws in the analysis and not merely disagreement as to the level of impact).

But, the mere existence of those concerns does not mean that the Project is automatically "highly controversial." The Court looks to whether the concerns went unaddressed or unanswered. The Corps was required to consider the objections of the NPS and the other voices expressing concern about the methodology, but the Corps, as the lead agency in this case, "is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances." *Sierra Club v. U.S. Dept. of Transp.*, 753 F.2d 120, 129 (D.C. Cir. 1985). The agency is not "required to accept every possible method of collecting and analyzing data." *Id.* And the Corps, as lead agency, need not "follow the [NPS's] comments slavishly—it just has to take them seriously." *Citizens Against Burlington, Inc. v. Busey*, 939 F.2d 190, 201 (D.C. Cir. 1991).

Here, the Court is convinced that the Corps considered the various methodological challenges raised by the interested parties and addressed their concerns appropriately. For instance, throughout the years, NPS challenged one of the key documents considered by the Corps—the visual effects assessment, entitled the Cultural Resources Effects Assessment ("CREA"). CREA—a more than 400 page document—contains photographs of the Project from key vantage points, line of sight analyses, and photo-simulations prepared by an expert consultant, Truescape, demonstrating how the River Crossing would appear to the human eye. AR 762.

After the Corps made the document public, NPS submitted letters criticizing the methodology employed by Truescape. In a March 2016 letter, for example, NPS asserted that the "visual simulation analysis" was "lacking" because it failed to look at how the Project would impact a visitor travelling "in close proximity to the proposed corridor where [the line] crosses the Captain John Smith Chesapeake National Historic Trail." AR 29990. In other words, NPS was concerned that while CREA's visual analysis captured what the electrical line would look like

from historical vantage points on land, it would not capture the impact to a visitor traveling by boat in the river. In response, the "Photosimulation Overview was updated in June 2016 to include nearly 80 pages of additional reference photographs and visual simulations depicting views from the river." 17-cv-1361, ECF No. 76-1 at 20. Moreover, the "Photosimulation Overview was updated again in August of 2016 to include additional simulations based on a second round of photographs taken from the river." *Id.* (citing AR 23648, AR 26402-19).

Moreover, from a process perspective, the Corps held discussions with NPS regarding its methodological concerns and received an NPS guidance document on how to evaluate visual impact assessments. AR 28801. The Corps forwarded the document to Dominion, asking them to address whether the methods used were comparable and what the plan would be going forward. *Id.*; AR 30383. Dominion demonstrated that the methodology used followed NPS guidance and provide reliable simulations of how the Project would look. AR 28552-87. Upon considering the methodological concerns raised by NPS and reviewing Dominion's updated analysis, the Corps concluded:

> Dominion's simulations provided enough accuracy to sufficiently analyze effects to both historic properties and a visitor's experience . . . While there are various methods for predicting visual impact it is not likely that employing further methods will result in substantively different views or information.

AR 751.

NPS also argued that the Corps' analysis was flawed because they failed to perform a socio-economic impact analysis. AR 29991. As NPS put it, that type of analysis was critical because "visual impacts affect visitors; visitors affect tourism; tourism affects local and regional economies, etc." *Id.* But again the Corps did not ignore those concerns. The Corps considered a report on the impact that the Project would have on tourism and ultimately concluded—based on

analysis of historic visitorship data—that construction and modern physical intrusions have no negative impact to visitorship. AR 694; AR 26215. Again it is not the conclusion that matters, but whether the Corps took the methodological concerns seriously.

The Court also considers the timeline of events in determining that the Corps' decision to issue a permit was not "highly controversial." It is true that NPS sent a detailed letter in January 2017—only a few months prior to NPS granting the permit—in which it pointed to "fundamental flaws" with the decisionmaking process that "remain unresolved." 17-cv-1361, ECF No. 85 at 32 (citing AR6012). Again, NPS called out the flawed visual analysis and the inadequate socioeconomic analysis. AR6015-6016. But as the Court has already demonstrated, the Corps was not required to accept as true NPS's critiques. All that was required was a serious consideration. And the record reflects that is what transpired.

The Corps also did not ignore that final letter. In response, senior staff at the Corps again met with the Interior Department officials to discuss the comments. In March 2017, the new Secretary of the Interior Zinkie, who ultimately presides over NPS, stated that the information that had been provided by the Corps reflected "thoughtful and thorough consideration of the issues raised by my predecessor." AR 4335. Moreover, CEQ informed the Corps that it supported the efforts to complete an EA, AR 4228-29, and the Assistant Secretary for Fish, Wildlife, and Parks signed the MOA on behalf of NPS.

Secretary Zinkie's letter effectively withdrew the Department of Interior's previous stance that an EIS was required. "As we all know, elections have consequences" and the Interior Department's shift in position demonstrates to the Court that there is no longer active disagreement between the Interior Department and the Corps. *Standing Rock Sioux Tribe*, 255 F.Supp.3d at 119. Moreover, the Court is satisfied based on its review of the record that the Corps sufficiently

addressed the methodological flaws identified by interested parties—that is the Corps carefully considered them, even though it ultimately did not agree with them. Accordingly, the Court does not find the Corps' approval of the Project and issuance of the FONSI to be "highly controversial" so as to compel the production of an EIS.

> b. *Unique Characteristics of Geographic Area and Impacts to Historic Places*

Plaintiffs further contend that an EIS is necessary because the Project will cause significant impact to "unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," 40 C.F.R. § 1508.27(b)(3), and "will result in significant impacts to 'district, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places....'" 17-cv-1361, ECF No. 68-1 at 31 (*citing* 40 C.F.R. § 1508.27(b)(8)). Plaintiffs highlight that the transmission line is planned to be "constructed directly *in the James River* where the transmission line and its mammoth towers will cross an important segment of the Congressionally-designated Captain [John] Smith [Chesapeake National Historic Trail]." 17-cv-1361, ECF No.68-1 at 28. According to plaintiff NPCA that fact "alone compels the need for an EIS since nothing in the Corps' EA or FONSI remotely refutes the common sense understanding and expert agency opinion that this river crossing will fundamentally and permanently alter the historical, cultural, and visitor experience for those traversing the Captain Smith NHT." *Id.* at 28-29. As plaintiffs National Trust and Preservation Virginia put it, "[i]mpacts to a more unique geographic area are difficult to imagine." 17-cv-1574, ECF No. 53-1 at 16.

There is no doubt that the geographic area in question is unique and that the Project will impact historic places. The transmission line will cross a segment of the James River listed on the National River Inventory for outstanding values "based on history" and will be in the vicinity of

numerous historical sites important to our nation's founding. AR 765.[2] In fact in the MFR, the Corps itself described the geographic area as a "unique and highly scenic section of the James River." AR 762. But as federal defendants note, "an EIS is not required for *every* project that may have an impact" on a unique area or a historic site, but only when an action "will cause *significant* impacts to those areas." 17-cv-1361, ECF No. 78-1 at 28. And the Court is convinced that the Corps reasonably concluded that the impacts would not be significant. In other words, its decision was not arbitrary and capricious.

As already discussed, the Corps extensively considered the potential impacts that the Project would have on the area. It reviewed the CREA, an over 400 page document, which included photo-simulations from several key observation points. AR 73812-4253. In response to feedback from NPS and Argonne Laboratories, the Corps also considered updated photo-simulations, including images from the perspective of boaters and kayakers along the river. AR 23684-735. Corps personnel "travel[ed] the James River by boat and observ[ed] the river from the important vantage points ...." AR 762. Following extensive analysis, the Corps concluded:

> In many landward areas, such as the vast majority of Jamestown Island, the project will not be visible due to existing tree cover and vegetation. Where the project will be visible, it is generally at such a distance that it is on the horizon (e.g., from Black Point on Jamestown Island). We note that from the vantage points closest to the project, (limited areas of Colonial Parkway, Grounds at Carters Grove, Jamestown Island –Hog Island – Captain John Smith Trail Historic District) the project will be a modern intrusion on the view, but we emphasize that it is not a blockage to viewing the river or the surroundings. Due to the distances from important vantage points, we conclude that the project will not dominate the view.

---

[2]    Plaintiff NPCA contends that the segment of the James River in question has "protected federal status" because it is an NRI listed river. 17-cv-1361, ECF No. 68-1 at 29. But federal protection attaches to rivers designated as "Wild and Scenic" under 16 U.S.C. § 1278, and no river in Virginia has been designated as such. Being listed on the NRI—which the segment of the James River in question is—merely indicates that the river is "potentially eligible" for designation and the agency must consider impacts. AR 756-66.

AR 763. The Corps also studied historical data and found that "there is no correlating variation in visitor ship when compared to past [infrastructure] events." AR 694.

The Court is further persuaded by the fact that boaters traveling along that segment of the river are already exposed to numerous modern intrusions on their view. As described by defendant-intervenor, a current day visitor to the area is greeted by "large de-commissioned Navy ships comprising the Ghost Fleet, the water tower at Fort Eustis, the Surry nuclear power station, and several large modern houses along the shoreline. In addition, a person traveling by boat is likely to see barges and other modern commercial vessels operating on the river at numerous points along the way, as well as recreational boaters and water skiers from Kingsmill Resort." 17-cv-1361, ECF No.76-1 at 47 (internal citations omitted). Plaintiffs respond that all of the existing land based intrusions are incomparable because they can be effectively screened by vegetation. But the analysis considered by the Corps did find that "vegetation and topography *will* effectively obscure the towers from many key observation points visitors might travel or recreate—including points on the CAJO Trail." 17-cv-1361, ECF No. 88 at 11 (*citing* AR 23690; 74028). And for the segments of the river where the Project will be unscreened, it will be similar in nature to the current modern intrusions along the river, such as the commercial ship and the Ghost Fleet.

Ultimately, the Corps did enough. It engaged in a reasoned analysis, consulted experts, responded to criticisms of both its methodologies and conclusions, took a hard look at the potential impacts, and concluded that the impact of the Project would be "moderate at most." AR 771. This may not satisfy the plaintiffs, but it is enough to satisfy the Court that the Corps had a rational basis for determining that the impacts would not be significant to the unique geographic area and historical places.

c. *Precedent and Cumulative Effects*

22

Plaintiff NPCA further contends that "putting 'gargantuan steel towers' in a unique historic locale where none previously existed, AR 6017, also 'establish[es] a precedent for future action with significant effects,' 40 C.F.R. § 1508.27(b)(6), still another CEQ significance criterion." 17-cv-1361, ECF No. 68-1 at 32. Sustaining the permit on this Project, according to NPCA, will open the door to other similarly intrusive projects. The Corps addressed this concern in its MFR, finding "that issuance of this permit will have no effect on the Corps' responsibility to comply with Federal law and regulation in its review of future projects and any future proposals will be fully subject to all necessary and appropriate review requirements based on case specific information." AR 687.

The Corps further posited that the effect of the decision to grant the permit in this matter "is purely speculative" since "commenters did not identify any future planned or reasonably foreseeable projects of concern." *Id*. The Court agrees. Nothing in the record indicates concrete plans for future development and a court in this Circuit found that "[t]he absence of any certain, or near certain, plans for future development" indicates that the action is not precedential. *Nat'l Parks Conservation Ass'n*, 177 F.Supp.3d at 32 (distinguishing its case from *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985), and *Friends of the Earth v. U.S. Army Corps of Engineers*, 109 F.Supp.2d 30 (D.D.C.2000), where the projects were found to be precedential, because the court found in its case that there were no "certain, or near certain, plans for future development.") Accordingly, the Court does not believe that this Project will bind the Corps in future permit decisions and the issuance of the permit without an EIS was not arbitrary and capricious.

For similar reasons, the Court rejects plaintiffs National Trust's and Preservation Virginia's argument that an EIS is required in this case because "it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. §1508.27(b)(7). "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to

other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Such impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.* "To invoke 40 C.F.R. § 1508.27(b)(7), a plaintiff must provide some evidence of ongoing or planned related projects." *Coal. On Sensible Transp. Inc. v. Dole*, 642 F. Supp. 573, 589 (D.D.C. 1986), *aff'd*, 826 F.2d 60 (D.C. Cir. 1987). Here, plaintiffs have provided no such evidence of ongoing or related projects. Merely asserting that the Project "is explicitly designed to remove obstacles to additional long-term growth in an area of extreme historic and scenic sensitivity," is not the same as identifying any specific related actions that will result in a cumulatively significant impact. 17-cv-1574, ECF No. 53-1 at 18.

Moreover, the Court is satisfied that the Corps independently considered the possible cumulative effects of the project. AR 736-39. In the MFR, the Corps describes that it analyzed the incremental impact that the project will create given the already existing infrastructure in the area and found that it would not "amplify the effects to a greater level." AR 740. The Corps also highlighted that land conservation efforts "will prohibit and/or severely limit future development along the river and shoreline." *Id.* For those reasons, the Court finds that the Corps' consideration of cumulative effects was reasonable, particularly in light of no actual future related projects having been identified.

### d. Highly Uncertain or Unique or Unknown Risks

The Court is also not persuaded by NPCA's argument that this is a situation where the effects are "are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). As federal defendants point out, courts have found this significance factor implicated when the risks involved uncertainty to the environment from new science or where the effects to a species

were unknown. *See, e.g., Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 153 (D.C. Cir. 1985) (finding that the consequences of dispersing genetically altered organisms were uncertain); *Anderson v. Evans*, 371 F.3d 475, 492 (9th Cir. 2004) (finding that the impact of first ever whale hunt on local whale population and ecosystem was highly uncertain and supported the need for an EIS). The case before the Court is inapposite. The impacts to the environment of the current project were well studied. The photo-simulations demonstrate what the Project will look like and how it will be observed from various sites. And this is certainly not the first time that the impacts from an infrastructure project had to be considered. *See e.g. Pogliani v. USACE*, 166 F. Supp. 2d 673, 698 (N.D.N.Y. 2001), *aff'd*, 306 F.3d 1235 (2d Cir. 2002).

### e.  Violation of Federal Law

Finally the Court rejects NPCA's contention that an EIS is required because the action "threatens a violation of Federal … law or requirements imposed for protection of the environment." 40 C.F.R. § 1508.27(b)(10). NPCA posits that the Project will cause impairment under the NPS Organic Act, because the Corps will have "acted in a manner that undermines NPS's duty to effectively promote and regulate lands under its jurisdiction and avoid impairment of these unique resources." 17-cv-1361, ECF No. 85 at 51 (quotation omitted). But that Act does not bind the Corps, only the Secretary of the Interior. 54 U.S.C. § 100101(a) ("The Secretary [of Interior] … shall promote and regulate the use of the National Park System . . . in such manner and by such means as will leave them unimpaired …."). Therefore, the Corps cannot violate the law by issuing this permit. Plaintiffs cite no case law in support of their argument. NPCA also argues that the CWA will be violated by issuing the permit. But the Court will separately address this issue later in this Opinion and find that the Corps fully complied with the CWA. In sum, the Corps had rational reasons for not finding that this action would threaten violation of a federal law.

### ii. Mitigation Measures

Plaintiffs also advance a number of arguments to demonstrate that the Corps failed to properly address the topic of mitigation and was therefore arbitrary and capricious in issuing a FONSI. The mitigation measures are outlined in the MOA, signed by the Corps, Dominion, the Director of the Virginia Department of Historic Resources, the Executive Director of ACHP, the Acting Assistant Secretary of Interior for Fish, Wildlife and Parks (on behalf of NPS), and the Chief of the Chickahominy Tribe. The MOA recognized the signatories "agreement . . . as the resolution of the Project's adverse effects on the historic properties identified in Attachment C in compliance with Section 106 of the NHPA and 36 C.F.R. § 800.6." AR 3128. Federal defendants summarize the requirements of the MOA as follows:

> With respect to the minimization and mitigation of adverse visual impacts to historic properties such as Carter's Grove, Colonial National Historic Park, and Jamestown National Historic Site, the MOA requires specific mitigation measures to decrease impacts. For example, the Project uses naturally weathered galvanized steel towers for visibility reduction, AR 3133; prohibits construction or placement of new transmission infrastructure, AR 3156; and requires Dominion to examine the ongoing electrical need for the Project every 10 years, and assess the feasibility of submerging the river crossing at the end of the 50-year lifespan of the Project, *id. See also* AR 741.
>
> In addition, the Corps has required compensatory mitigation outlined in the MOA, including interpretive signage, AR 3131-32; landscape documentation, AR 3132; a heritage tourism and visitor experience study, AR 3136-37; and site-specific projects that consulting parties must approve to ensure they "enhance and/or contribute to preservation of the setting and feeling" of historic sites.

17-cv-1361, ECF No. 78-1 at 52.

Plaintiffs' primary argument challenging the mitigation plan is built on a false premise. They contend that the Corps prepared a Mitigated FONSI and were therefore responsible for identifying "'specific mitigation measures which *completely compensate for any possible adverse environmental impacts stemming from the original proposal*' to ensure that 'the statutory threshold

of significant environmental effects is not crossed and an EIS is not required.'" 17-cv-1361, ECF No. 86 at 16 (citing *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982). And since, according to the plaintiffs, the mitigation measures will certainly not "completely compensate" for the impacts of the Project, the Corps issuance of the permit based on a FONSI was arbitrary and capricious.

There are circumstances where an agency must prepare a Mitigated FONSI. Namely, agencies are required to undertake that work "[i]f the action will not have such [significant] impact *because of* the agency's commitment to ensure the performance of mitigation measures ...." *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 113 (emphasis added). But that is not what is happening here. The Corps found that the impacts of the Project, independent of any mitigation measures, were not significant. *See e.g.* AR 688 ("[t]he majority of environmental impacts associated with this [P]roject are minimal in nature"); AR 694 ("[w]hile properties within the projects view shed may experience some impact we expect it to be minimal"); AR 695 ("any impacts to water quality and marine life will be insignificant"); AR 696 ("[w]hile cumulative visual impacts will accumulate with past, present, and reasonable foreseeable actions, the incremental effect of the proposed project will not amplify the effects to a greater level"); AR 733 (impacts on navigation are "negligible"); AR 739, 742 ("the cumulative impacts are not considered to be significantly adverse"); AR 771 ("we conclude that the actual aesthetic effect of this project will be moderate at most").

NPCA posits that the federal defendants, through their own words, concede that the Corps undertook a Mitigated FONSI. NPCA points to federal defendants' explanations that "mitigation measures incorporated in the MOA would help compensate for harm to setting and feeling, *ensuring the Project's impact remains below the level of significance*" and that "while the

proposed project may have *detrimental* aesthetic effects, *the proposed mitigation will balance those effects*[,] resulting in a net minimal effect." 17-cv-1361, ECF No. 86 at 15 (emphases in original) (citing ECF No. 78-1 at 35, 30). But both of those comments do not prove that federal defendants believed the harms were above the significance threshold absent the mitigation measures. Rather, they reinforce the notion that the mitigation measures will further reduce the impacts from "moderate at most" to something even lower. At no point in the record, as far as the Court is concerned, does the Corps represent that the impacts, absent mitigation measures, will be significant.

Plaintiffs additional critiques can be bucketed into three categories: (1) that the dollar amount of the mitigation efforts (approximately $85 million) itself confirms that the impacts are significant; (17-cv-1361, ECF No. 85 at 17; 17-cv-1574, ECF No. 69 at 16-17); (2) that the mitigation plan does not adequately address the impacts of the project (17-cv-1361, ECF No. 85 at 17-22; 17-cv-1574, ECF No. 69 at 17); and (3) that the specific mitigation measures are uncertain and unenforceable (17-cv-1574, ECF No. 69 at 17-18). All three arguments are without merit.

First, it is entirely conjectural to argue that merely because Dominion plans to spend approximately $85 million in mitigation efforts that the impacts must be significant. The plaintiffs confound monetary value with what is legally significant. Nowhere in NEPA is that connection made and plaintiffs provide no authority for that supposition.

Plaintiffs' second argument is built on the false premise that the Court discussed above. Namely, that the mitigation plan is required in order to get the impact level below the significance threshold. But, the Corps made a "convincing case" why the impacts are "moderate at most," meaning that mitigation efforts are not required to justify the decision to issue a FONSI. Even

when an agency must discuss mitigation measures in the context of an EIS, it is only required to discuss mitigation "in sufficient detail to ensure that environmental consequences have been fairly evaluated...." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989)). The Corps met that standard in this case. It devoted considerable effort to studying mitigation measures. For instance, federal defendants highlight that the Corps considered the following minimization and avoidance measures:

- the construction of overland portions of the Project in existing transmission rights of way;

- the clearing of wetlands by hand;

- the placement of towers by maximum span lengths in the James river;

- the use of bubble curtains during pile driving activities to protect sturgeon;

- the use of an April 24, 2017 MOA that requires Dominion to develop and implement an approved avoidance plan for underwater and terrestrial archaeological sites; and

- the use of an April 24, 2017 MOA that imposes obligations on Dominion to examine all available and feasible tower coatings.

17-cv-1574, ECF No. 61-1 at 51-52 (citing AR 665-67, 738-39).

Moreover, multiple drafts of the MOA were circulated to consulting parties, with the Corps requesting written comments on each draft. Ultimately the MOA was signed by consulting parties, including leadership at DOI and ACHP, further supporting the Corps' finding that the impacts were below the significant level. AR 3128 (signatories recognized their "agree[ment] ... as the resolution of the Project's adverse effects on the historic properties identified in Attachment C in compliance with Section 106 of the NHPA and 36 C.F.R. § 800.6."); *S. Utah Wilderness All. v.*

*Norton*, 326 F. Supp. 2d 102, 119 (D.D.C. 2004) (recognizing "concurrence [of consulting parties in the NHPA process] cannot be ignored, as this concurrence evidences a small likelihood of significant effects on the environment").

The Court also finds plaintiffs' third argument meritless. Plaintiffs National Trust and Preservation Virginia contend that "neither MOA nor the MFR details the specific compensatory actions that must be taken" and that the MOA does not require that all of the approximately $85 million be spent. 17-cv-1574, ECF No. 69 at 17-18. But the D.C. Circuit has explained that "[t]he procedural requirements of NEPA do not force agencies to make detailed, unchangeable mitigation plans for long-term development projects." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C.Cir. 2010). Plaintiffs are trying to hold the Corps to a more stringent standard than what NEPA contemplates. The Corps comprehensively analyzed how the mitigation measures will work in Attachment F to the MOA, which was incorporated into the MFR. AR 3226-50; 752. The Corps has met its obligations under NEPA.

### 2. *Analysis of Alternatives to the Project*

Plaintiffs also allege that the Corps failed to meet its NEPA obligations to consider alternatives to the permitted Project. To comply with NEPA, an Environmental Assessment must include a "'brief discussion[ ]' of reasonable alternatives to the proposed action." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (quoting 40 C.F.R. § 1508.9(b)). This consideration "need not be as rigorous as the consideration of alternatives in an EIS." *Id.*; *compare* 40 C.F.R. § 1508.9(b) (requiring "brief discussion[]") *with id.* § 1502.14(a) (requiring agency to "[r]igorously explore and objectively evaluate all reasonable alternatives" when EIS required). "An alternative is 'reasonable' if it is objectively feasible as well as 'reasonable in light of [the agency's] objectives.'" *Myersville*, 783 F.3d at 1323 (*quoting Theodore*

*Roosevelt Conservation P'ship* 616 F.3d at 72). An agency's "specification of the range of reasonable alternatives is entitled to deference." *Id.* And "an agency need only 'briefly discuss the reasons' why rejected possibilities were not 'reasonable alternatives.'" *Tongass Conservation Soc'y v. Cheney*, 924 F.2d 1137, 1141 (D.C. Cir. 1991) (quoting 40 C.F.R. § 1502.14(a)).

The Corps' stated purpose for the Project is "[t]o continue providing the North Hampton Roads Load Area (NHRLA) with reliable, cost effective, bulk electrical service consistent with mandatory North American Electric Reliability Corporation (NERC) Reliability Standards for transmission facilities and planning criteria." AR 675. The MFR includes an analysis of at least twenty-eight alternatives. AR 699-709. The Corps concluded that of those twenty-eight alternatives, only two were practicable in light of the project purpose— the permitted Project and the Chickahominy-Skiffes Creek alternative. Of those two, the Corps found the permitted Project to be the less environmentally impactful option. Plaintiffs, however, focus their critique not on that analysis and decision, but rather contest whether the other twenty-six alternatives should have been eliminated as impracticable. Plaintiffs highlight two sets of alternatives—underwater options and alternatives suggested by the engineers at Tabors (a firm retained by plaintiff National Trust)—that they believe the Corps arbitrarily and capriciously dismissed from consideration as viable alternatives. The Court disagrees.

The record indicates that the Corps adequately considered multiple variations of underwater transmission lines, including the possibility of an underwater line combined with additional transmission facilities—the alternative that plaintiffs believe would be feasible. *See* 17-cv-1574, ECF No. 53-1 at 26-27. The Corps concluded that the "option would only achieve electrical compliance with NERC Reliability Standards until 2032 (about ten years less than the proposed Project), be 'cost prohibitive,' take '5 years to construct,' and have greater aquatic

resource impacts." 17-cv-1574, ECF No. 59 at 45 (*citing* AR 4344; AR 691). That option was found to be unreasonable because it would take twice as long to complete and cost three times as much to build. AR 710; 711-12; AR 691. Additionally, the Corps concluded that once the underwater line was constructed it would be far more difficult to repair, leading to longer outages. AR 691.

Given those considerations, it was proper for the Corps to find the underwater alternatives not reasonable. In light of its stated purpose for the Project, the Corps could consider compliance time and cost in deciding to eliminate alternatives. It was certainly not arbitrary and capricious to do so. *See Citizens Against Burlington*, 938 F.2d at 198 (upholding elimination of alternatives that "would mean technological problems and extravagant costs"); *see also Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1063 (D.C. Cir. 2017) (approving the agency's approach to narrowing of alternatives based on "effectiveness in meeting project goals, engineering feasibility, [and] cost" among other factors). Despite plaintiffs' concerns, the Court is convinced that the Corps adequately analyzed the issue and came to a reasonable conclusion. *See* AR 4337 ("[T]he Corps has independently evaluated information supplied by Dominion, as well as information on alternatives supplied through public, agency, and consulting party comments, including the latest input and proposed alternatives provided by [PERI] and [Tabors].").

The Corps also considered the alternatives presented by Tabors and eliminated them on the basis that they would not be NERC compliant,[3] another of the stated purposes of the Project. AR 702-03. The Corps carefully considered Tabors' perspective that the alternatives would not be

---

[3] Dominion also asserted that the alternatives were not reasonable given cost and construction time. AR 5720-22.

costly and would be NERC compliant, *See e.g.*, AR 6212, but ultimately "found Dominion's information in support of the preferred alternative compelling from a technical perspective," AR 5548-49, and concurred that "the other alternatives, outside of Dominion's preferred, are either electrically unavailable or not practicable due to cost and/or logistics." AR 5549. In reaching its conclusion, the Corps also considered the analysis of a third-party, PJM, on the topic of NERC compliance. AR 6199. PJM reviewed the alternatives and "completed a series of analyses consistent with RTEP procedures and found that none of the four proposed alternatives address all of the [NERC] reliability criteria violations that are being addressed by the Skiffes Creek 500kV project." AR 5132. On that basis, the Corps dismissed alternatives for failing to meet a critical purpose of the Project—NERC compliance. AR 702-03.

The Corps reasonably arrived at that conclusion, given its consideration of Dominion's, PJM's, and its own analysis. The Court will not second guess those findings, despite Tabors' and the plaintiffs' misgivings. All NEPA requires is for the agency to "briefly discuss" its reasons for eliminating an alternative. The Corps certainly met that burden here and did not act arbitrarily and capriciously in considering alternatives to the Project.

### 3.     *Opportunity for Public Review of the EA and FONSI*

Finally, the Court turns to plaintiffs' argument that the Corps violated its NEPA obligation by failing to circulate a draft EA and FONSI for public review and comment, and failing to allow meaningful participation in the NEPA process. NEPA requires federal agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(b). And must only involve the public "to the extent practicable" in the preparation of the EA. 40 C.F.R. § 1501.4(b). Under CEQ regulations,

> In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no

significant impact available for public review ... for 30 days before the agency makes its final determination whether to prepare an [EIS] and before the action may begin. The circumstances are: (i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or (ii) The nature of the proposed action is one without precedent.

40 C.F.R. § 1501.4(e)(2). The D.C. Circuit has indicated that an "agency has significant discretion in determining when public comment is required with respect to EAs." *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006). Here, the Court finds that the Corps properly exercised its discretion in not circulating a draft of the EA and FONSI.

The first "limited circumstance" identified in the regulation above is whether the action is closely similar to one normally requiring an EIS under the agency's procedures. And under Corps regulations, adopted pursuant to 40 C.F.R. § 1507.3, individual permitting actions "will normally require only an EA," and not an EIS. 33 C.F.R. § 230.7(a). Therefore, since the Project here is a regulatory permitting action, the first circumstance is not implicated.[4]

The second "limited circumstance" also does not apply to this case. This action is not without precedent, both within the region that the Project is proposed to be built and more broadly. As the Court has already discussed in detail, the geographic area at issue already contains numerous modern intrusions. Plaintiffs continue to contest that those intrusions pale in comparison to this Project, given that they are situated on land and are better screened. But the

---

[4] Plaintiffs strenuously contest this logic, arguing that "the project—which by any definition is a major transmission line project and associated infrastructure affecting myriad NPS-managed national park, historic, and cultural resources—is the kind of project that ordinarily *does* require an EIS, and NPS and others identified similarly situated transmission line projects that *all* required preparation of an EIS despite having far *less* impact than the project at issue here." 17-cv-136, ECF No. 85 at 69. But that is of no moment. The regulation specifically limits the circumstance to an action normally requiring an EIS "under the procedures adopted by the agency." 40 C.F.R. § 1501.4(b). As explained above, the Corps normally requires an EA for regulatory permitting actions, which no matter how large in scope is what is at play in this case.

Court has already addressed that argument earlier in this opinion. The Corps demonstrated that a number of the modern intrusions can be seen from the river, including "[t]he Highway 17 Bridge, Ft. Eustis, Surry Nuclear Plant, [and the] VDOT James River Ferry." AR 729-30. Therefore, it was reasonable for the Corps to conclude that the Project was not without precedent. *See All. to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 115 (1st Cir. 2005) (finding that a data tower proposal was not without precedent because similar intrusions existed in Martha's Vineyard). In addition, the Project is not without precedent given that courts have approved modern development in a similar context without the requirement that an EIS be produced. *See, e.g., Pogliani* 306 F.3d at 1238 (2d Cir. 2002) (per curiam) (denying injunction of Corps permit for construction of power plant near Hudson River).

NEPA requires circulation of a draft EA and FONSI in limited circumstances. Neither of the two circumstances outlined in CEQ regulations apply to this context. Accordingly, the Corps properly exercised its discretion and its decision to not circulate the EA and FONSI was not arbitrary and capricious.[5]

## B. The Corps' Compliance with the CWA

---

[5]     In arguing that circulation of a draft EA and FONSI was required, plaintiffs also rely on a document entitled "CEQ's Forty Most Asked Questions" ("Forty Questions"). 46 Fed. Reg. at 18,037. That document clarifies that public review and comment is necessary whenever (i) there is a reasonable argument for preparation of an EIS; (ii) the proposed action is new, unusual, or precedent-setting; (iii) there is either scientific or public controversy over the proposed action; *or* (iv) the proposed action is located in a floodplain or wetland. *See* 46 Fed. Reg. 18026, 18037 (Mar. 23, 1981).
     The parties dispute whether that document is persuasive authority in this context. Notably, the D.C. Circuit has held it to be "merely . . . informal statement[s]" and "not a regulation, and we do not find it to be persuasive authority." *Cabinet Mountains Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C. Cir. 1982) (citations omitted). That being said, the Court need not delve into that analysis, because it is clear based on CEQ regulations—that the Corps must consider—that public review and comment was not necessary.

Plaintiffs in both cases also move for summary judgment on the basis that the Corps violated its obligation under the CWA. As discussed earlier in this opinion, in order to grant a permit pursuant to Section 404 of the CWA, the Corps must conduct a "Public Interest Review." 33 C.F.R. § 320.4(a). The Corps evaluates the "probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.* at 320.4(a)(1). The Corps must carefully weigh the benefits of the proposed action against the "reasonably foreseeable detriments." *Id.*

The Corps must also consider if there is a "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

### 1. Public Interest Review

The MFR indicates that the Corps undertook a careful weighing of the detriments and benefits of the proposed project. Contrary to the claims of plaintiffs National Trust and Preservation Virginia, the Corps gave due consideration to historic, cultural, scenic and recreational values impacted by the Project. *See e.g.*, AR 729-731. As the Court has already discussed, the Corps reasonably concluded that the impacts were moderate at best. The Corps weighed against those impacts the "public safety and welfare implications of rolling blackouts and cascading electrical grid failures in the absence of the permitted Project on a peninsula that contains more than 590,000 citizens, several major military installations, an airport and military airfield, universities, industrial facilities, recreational facilities, deep-water shipping channels, and

a port complex." 17-cv-1574, ECF No. 61-1 at 73 (*citing* AR-672-675, 689-690, 727-729, 733-735).[6]

Plaintiffs continue to stress the vociferous opposition voiced by NPS and others. For instance, NPS concluded that "granting a permit would be contrary to the public interest given the severe environmental consequences of this project." AR 29992. But in performing a public interest review, "the Corps is not bound to agree with the conclusions reached by these resource agencies, but simply required to listen to and consider their views in the decisionmaking process." *Sierra Club v. USACE*, 772 F.2d 1043, 1054 (2d Cir. 1985). And that is precisely what the Corps did here. In this case the "Corps solicited the other federal and [] agencies' views, encouraged their participation in the [] process, and gave full consideration to their comments [], all of which is evident from the detailed responses that the Corps prepared in assessing those agencies' comments." *Id*. As with the Corps obligations under NEPA, the Court will require no more because the CWA requires no more. The Corps carefully considered the comments before it, but independently weighed the benefits against and costs and determined that the Project is in the public interest.

### 2. *Alternatives Analysis*

Under the CWA, an agency must first consider whether there is a *practicable* alternative that is less damaging before permitted the proposed action. Crucially, the Corps determines whether an alternative is practicable before it is required to assess impact. 40 C.F.R. § 230.10(a).

---

[6]      NPCA challenges whether there are truly public health and welfare implications because the Department of Energy has committed to reissue emergency orders to run two coal-fired units at Dominion's Yorktown Generating Station until the project is completed. 17-cv-1361, ECF No. 63-64. But as defendant-intervenors rightly point out, those orders are necessary because there is an *emergency*. Completing a project that will allow the emergency stop gap measures to abate is certainly a benefit that should be considered in a public interest review.

"Practicable" takes into account cost, existing technology, and logistics in light of overall project purposes. 40 C.F.R. § 230.3(l). For reasons already discussed in the NEPA section of this Opinion, the Corps reasonably concluded that twenty-six of the twenty-eight alternatives were not practicable. Specifically, seventeen fail to meet the project's purpose because they are not NERC compliant, and nine were deemed not practicable given that they were either too costly, too time consuming, or not logistically feasible. *See* AR-706-707, 710, 715-716. Ultimately, the Corps took this responsibility seriously. It engaged in a multi-year analysis of alternatives and drew upon comments from other parties.

Plaintiffs counter by arguing that the Corps failed to *independently* determine that twenty-six of the twenty-eight alternatives were not practicable for reasons of NERC compliance, time, cost, and logistics. *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1265-68 (S.D. Fla.) (finding that the Corps failed to independently evaluate the practicability of alternatives). Plaintiffs assert that, as in *Sierra Club*, the Corps merely accepted Dominion's analysis without any independent evaluation. But this case is inapposite. The record is rife with evidence that the Corps did not blindly accept Dominion's analysis.

For example, the Corps independently authored white papers analyzing alternatives, AR 4337-45, AR 73302-09, and concluded that it "considered all information supplied to date from both Dominion and the public. Additionally, Corps Electrical Engineers have evaluated the information for technical accuracy. In screening the various alternatives, the Corps focused on the ability to sustain sufficient power supply to meet current demand and predicted future growth, existing technology, implementation cost and ability to maintain/achieve compliance with federal laws." AR 73308. Moreover, the Corps' chief electrical engineer noted that he "found Dominion's information in support of the preferred alternative compelling from a technical perspective and for

the reasons elaborated upon in the White Paper concur with the preliminary conclusion that other alternatives, outside of Dominion's preferred, are either electrically unavailable or not practicable due to cost and/or logistics." AR 4567.

Given the extensive analysis conducted here, the Corps succeeded in rebutting the presumptions arising under 40 C.F.R § 230.10(a)(3). Under Section 230.10(a)(3), applicants that seek permits for non-water-dependent projects must rebut two presumptions: (1) that other "practicable alternatives exist that do not involve special aquatic sites," and (2) that "practicable alternatives . . . which do not involve a discharge into a special aquatic site that are presumed to have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a)(3). The record of this case demonstrates that the Corps reasonably concluded that the only practicable alternative to the permitted Project—the Chickahominy-Skiffes Creek alternative—also requires crossing the James River. Since that alternative would have a greater overall impact, the Corps properly concluded that the proposed Project could be permitted.

### C. The Corps' Compliance with the NHPA

The Court turns to addressing whether the Corps met its obligations under the NHPA. Section 106 of the NHPA requires that agencies undertaking a project expected to adversely affect a public or private site listed on the National Register of Historic Places "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. The ACHP has promulgated regulations governing the Section 106 consultative process, which the Corps carried out in the present case. Plaintiffs have not brought a challenge pursuant to Section 106. Rather, plaintiffs National Trust and Preservation Virginia assert that the Corps failed to meet its obligations under Section 110(f) of the NHPA, which applies to National Historic Landmarks ("NHLs"). Section 110(f) provides:

> Prior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

54 U.S.C. § 306107.

There is no disputing that Carter's Grove, an NHL, will be impacted by the proposed Project. The key question, though, is whether Carter's Grove will be *directly* impacted. Defendants argue that the Corps was not required to comply with Section 110(f) because it applies only to actions that "directly" affect an NHL. And when the statute refers to "direct" effects, it refers to effects with a *physical* impact. Since the Project will not be built on the site of Carter's Grove, and because the closest visible tower will sit 1.76 miles from the main house at Carter's Grove, the impacts are strictly visual, not physical. Accordingly, Carter's Grove is *indirectly* affected, not *directly* affected, as is required for Section 110(f) to be implicated.

Plaintiffs, on the other hand, argue that the plain meaning of "directly" as used in the Section refers to whether the "effects on Carter's Grove will be the direct result of the Project itself." 17-cv-1574, ECF No. 69 at 33. Since "[t]here is no intervening cause," Carter's Grove is directly affected and Section 110(f) applies to this case. In other words, "directly" refers to causation rather than physicality, and NPS asserted during the consultative process that the Project would directly impact Carter's Grove.

The Court is aware of no case that speaks directly to the definition of "directly" in Section 110(f). But defendant-intervenor does highlight that the cases where courts have found Section 110(f) to be implicated all involved physical, not visual, impacts to NHLs. 17-cv-1361, ECF No. 87 at 33 (*citing Presidio Historical Ass'n v. Presidio Tr.*, 811 F.3d 1154 (9th Cir. 2016); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215 (5th Cir. 2006); *Neighborhood Ass'n of the Back Bay*,

*Inc. v. Fed. Transit Admin.*, 463 F.3d 50 (1st Cir. 2006); *see Vieux Carre Prop. Owners, Residents and Assocs., Inc. v. Pierce*, 719 F.2d 1272 (5th Cir. 1983); *Lee v. Thornburgh*, 877 F.2d 1053 (D.C. Cir. 1989); *Lesser v. City of Cape May*, 110 F. Supp. 2d 303 (D.N.J. 2000).

The Court is persuaded that the meaning of "directly" in Section 110(f) refers to physical impacts, not causation. In addition to the fact that every court that has found Section 110(f) to be implicated in a project dealt with physical effects, ACHP regulations outlining the Section 106 consultative process explain that an "adverse effect is found when an undertaking may alter, *directly* or *indirectly,* any of the characteristics of a historic property." 36 C.F.R. § 800.5 (emphases added). An ACHP and CEQ guidance document on the Section 106 process further defines "direct effects" as including "demolition of a historic building, major disturbance of an archaeological site, or any other actions that *occur to the property itself.*" AR 29716 (emphasis added). "Indirect effects" are those that "change the character of the property's use or physical features within the property's setting that contribute to its historic significance; are often audible, atmospheric, and *visual effects*; and may relate to *viewshed issues.*" *Id* (emphasis added). The Corps relied on these definitions in finding that Section 110(f) did not apply. AR 25871.[7]

Plaintiffs counter that the guidance document cited by the defendants relates to coordinating the Section 106 consultative process with NEPA, and is not meant to interpret an agency's obligations under Section 110(f). They also note that Congress gave NPS, not ACHP, the authority to implement guidelines interpreting Section 110(f). *See, e.g.*, 54 U.S.C. § 306101. But, "Section 110(f) cannot be read in a vacuum" as it "builds on the general consultation process

---

[7]    The fact that the Corps in a June 2016 email noted that Section 110(f) does not apply because the effects of the Project are indirect on Carter's Grove rebuts plaintiffs' argument that the finding is a post hoc litigation position. It is not clear to the Court whether that would even matter since whether the statute applies is a legal question for the Court to determine. But in any event, the Corps held that position for almost a year prior to signing the MOA.

set out in Section 106." *Presidio Historical Ass'n*, 811 F.3d at 1169. It makes sense to consider

how ACHP guidance documents interpret the difference between "direct" and "indirect" when

they speak directly to that issue. In contrast, plaintiffs do not point to any reference within the

NPS Guidelines interpreting Section 110(f) that addresses the definition of "indirectly." The NPS

Guidelines are silent on that issue. 63 Fed. Reg. 20,496. That NPS took the position that the

effects were direct in this case does not provide the Court with reason to defer to their interpretation

of Section 110(f).[8] Ultimately, the Court is convinced that "directly" within the statute is best

understood to refer to physical damages to the property itself, not visual impacts. There is no basis

to find that "directly" in Section 110 means something different from how "direct" effects are to

be considered in the Section 106 consultative process.

Finally, even if Section 110(f) did apply in this context, the plaintiffs have not

demonstrated that the Corps failed to follow the heightened procedural requirements. Plaintiffs

have not cited to, and the Court is not aware of, a single case where a court held an agency violated

Section 110(f). That does not mean that there will never be a first, but this case is not it. "Section

110 does not affirmatively mandate the preservation of historic buildings or other resources" and

only requires an agency "to comply to the fullest extent possible with, and in the spirit of, the

---

[8]     Defendants also make much of the fact that NPS itself appears inconsistent in its approach
to visual effects. They highlight the Cape Wind energy project, which involved building 130 wind
turbine generators up to 440 feet tall, that were visible but not physically outside two NHLs (the
Nantucket Historic Landmark District and the Kennedy Compound). AR 30087. NPS concluded
that the Project would "have no direct adverse effect" because the effects were "visual only." AR
30098. Defendants argue that NPS's position in that case demonstrates that it too interprets purely
visual effect to be indirect. But defendants failed to mention that NPS continued as follows: "[a]s
these determinations are necessarily made on a case by case basis, the conclusions the NPS reaches
[for Cape Wind] that the visual intrusions are not a direct and adverse effect does not affect the
NPS's ability in other circumstances to find that a visual intrusion can cause a direct and adverse
effect on an NHL." *Id.* It appears then that NPS's approach with regard to the Cape Wind project
was not inconsistent with their approach to this Project.

Section 106 consultation process ...." *Oglala Sioux Tribe v. U.S. Army Corps of Eng'rs*, 537 F. Supp. 2d 161, 173 (D.D.C. 2008) (quoting *Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996)).

Plaintiffs highlight that the Corps failed to follow NPS's Section 110 Guidelines. In particular, the Guidelines require the lead agency to "consider all prudent and feasible alternatives to avoid an adverse effect on the NHL." And before determining that any alternative is infeasible, the agency must undertake a three-part balancing test to weigh the potential grounds for infeasibility against the preservation purpose of Section 110(f). 63 Fed. Reg. at 20503. But these guidelines are non-binding. *Lesser v. City of Cape May*, 110 F. Supp. 2d 303, 323-24 (D.N.J. 2000) (citing 63 Fed. Reg. 20,496 (April 24, 1998) ("These guidelines have no regulatory effect. Instead, they are the Secretary's formal guidance to each federal agency on meeting the requirements of section 110 of the Act.")).

Ultimately, the NHPA, like NEPA, "is a procedural statute requiring government agencies to 'stop, look, and listen' before proceeding when their action will affect national historical assets." *Presidio Historical Ass'n*, 811 F.3d at 1169 (internal citations omitted). Section 110 does not impose heightened substantive requirements, but rather additional procedural requirements. *Id*. at 1171. The Ninth Circuit in *Presidio* found that the heightened procedural requirement amounted to requiring agencies to consider alternatives. Here, as has already been discussed at length, the Corps considered twenty-eight alternatives to the Project. Moreover, the Corps noted that the approved Project was chosen in part because it had the fewest towers visible from Carter's Grove (two) from the other alternatives considered. AR 716-718. Finally, the MOA outlines measures to reduce the visual impacts to Carter's Grove. AR 741. The Corps carefully considered the adverse effects to Carter's Grove and explored methods to reduce that impact. The Corps'

procedural undertakings meet the heightened standard of care imposed by Section 110(f) to undertake "to the maximum extent possible ... planning and actions ... to minimize harm to the landmark." 54 U.S.C. § 306107. [9]

## IV.    CONCLUSION

For the reasons stated herein, the Court **DENIES** the plaintiffs' motions for summary judgment, and **GRANTS** federal defendants' and defendant-intervenor's motions for summary judgment in their entirety. The case is hereby **DISMISSED**. A separate Order accompanies this Memorandum Opinion.

It is **SO ORDERED.**

Date: May **23** 2018

Royce C. Lamberth
United States District Judge

---

[9]     The Court is also not persuaded by plaintiffs' argument that the Corps was required to articulate its Section 110(f) findings in the MFR. Section 110(f) makes no such requirement. Ultimately what matters is whether the agency complied with the heightened procedural standards.